## Girard Will Case.

Argued April 26, 1956.  Before STERN, C. J., JONES, BELL, CHIDSEY, MUSMANNO and ARNOLD, JJ.

reargument refused December 20, 1956.

*William T. Coleman, Jr.,* and *Raymond Pace Alexander,* with them *Louis H. Pollak,* for applicants, appellants.

*Lois G. Forer,* Deputy Attorney General, with her *Herbert B. Cohen,* Attorney General, for Commonwealth, appellant.

*Abraham L. Freedman,* Special Counsel, with him *David E. Pinsky* and *Jacob J. Siegal,* Assistant City *Solicitors,* and *David Berger,* City Solicitor, for City of Philadelphia, appellant.

*Joseph P. Gaffney,* Solicitor, and *Owen B. Rhoads,* Associate Counsel, for Board of Directors of City Trusts, appellee.

*Lewis M. Stevens,* with him *S. Gordon Elkins, James K. Baker, Sidney Schulman,* and *Leon I. Mesirov,* for Philadelphia Fellowship Commission, amicus curiae.

OPINION BY MR. CHIEF JUSTICE HORACE STERN, November 12, 1956:

While it may seem unfortunate that the court is obliged to sanction the exclusion of any child from even a *private* school or orphanage because of race, creed or color if otherwise entitled to admission, the Court is clearly of opinion that the unanimous decision of the Orphans' Court, supported by the learned and comprehensive opinions of Judge BOLGER and Judge LEFEVER, must be affirmed, it being clearly understood at the outset that the beneficiaries of the charity of Stephen Girard are not being determined by the State of Pennsylvania, nor by the City of Philadelphia, nor by this Court, but solely by Girard him-

self in the exercise of his undoubted right to dispose of his property by will, and, in so doing, to say, within the bounds of the law, who shall enjoy its benefits.

Stephen Girard,—merchant, mariner, banker and philanthropist,—died on December 26, 1831; his will, dated February 16, 1830, and two codicils thereto, were probated at Philadelphia five days later. The will is, in many respects, a remarkable document; it was prepared with the aid of William J. Duane, distinguished leader of the bar in his day, and was the product of protracted consultations between them which extended over the course of some five or six weeks. Briefly summarized, it provided, after making a number of specific gifts to various institutions and individuals, for a devise and bequest of his entire residuary estate to "The Mayor, Aldermen and Citizens of Philadelphia"[1] their successors and assigns, in trust to erect a "college" on a square of ground between High and Chestnut Streets and 11th and 12th Streets, in the City of Philadelphia (by a codicil he changed this location to an estate he had purchased on "the Ridge Road in Penn Township."). He stated that "I am particularly desirous to provide for such a number of poor male white orphan children, as can be trained in one institution, a better education as well as a more comfortable maintenance than they usually receive from the application of the public funds". He provided for the selection of a competent number of instructors, teachers, assistants and other necessary agents, and that as many poor white male orphans, between the ages of six and ten years as the

---

[1] This was the corporate name of the city under the Act of March 11, 1789, 2 Sm. L. 462. The title was changed by the Consolidation Act of February 2, 1854, P. L. 21, to "The City of Philadelphia."

income should be adequate to maintain, should be admitted into the college, preference being given first to orphans born in the City of Philadelphia, secondly, to those born in any other part of Pennsylvania, thirdly, to those born in the City of New York, and lastly, to those born in the City of New Orleans. He provided that the orphans admitted into the college should be "there fed with plain but wholesome food, clothed with plain but decent apparel (no distinctive dress ever to be worn) and lodged in a plain but safe manner"; due regard was to be paid to their health, and to that end they were to have suitable exercise and recreation, and he prescribed in detail the branches of education in which they should be instructed. He declared that "together with the object just adverted to [that is, the provision for the poor male white orphans], I have sincerely at heart the welfare of the City of Philadelphia, and, as a part of it, am desirous to improve the neighborhood of the River Delaware . . .", and accordingly, he bequeathed out of the residue the sum of $500,000 in trust to pave Delaware Avenue and Water Street and to make certain other improvements in that part of the city. After a bequest to the Commonwealth of Pennsylvania of $300,000 he left the remainder of his residuary estate in trust to apply the income to the further improvement and maintenance of the college, to enable the city to provide for a competent police force, and to improve the property and general appearance of the city. He stated that "To all which objects, the prosperity of the City, and the health and comfort of its inhabitants, I devote the said fund as aforesaid, and direct the income thereof to be applied yearly and every year for ever—after providing for the College as hereinbefore directed, as my primary object." If the city should knowingly and wilfully violate any of the conditions in the will, the

said remainder of the residue was given to the Commonwealth of Pennsylvania for the purposes of internal navigation, except that the income from his real estate in Philadelphia was to be forever applied to the maintenance of the college; if the Commonwealth failed to apply the bequest to the purposes mentioned, the said remainder was given to the United States of America for the purposes of internal navigation. There was a provision in the will that the city should keep separate accounts of the trust funds, which were not to be used for any but the prescribed purposes, and should furnish an annual account thereof to the legislature.

Because of the financial panic of 1837 and the consequent shrinkage of the assets of the estate there was some delay in the construction of the buildings and the college was not opened until January 1, 1848. Since that time, a period now of over a hundred years, it has been conducted in conformity with the purposes expressed in Girard's will. As is not altogether unusual in such cases, some of his heirs were disappointed at the disposition he made of his wealth, and accordingly they indulged in a number of attacks upon the validity of the will, the first of which resulted in the famous argument in the Supreme Court of the United States in 1844 between Daniel Webster on the one side and Horace Binney on the other. Two main questions were there involved, one, whether the city had the legal power to accept the trust confided to it, and the other, whether the trust in regard to the college was rendered invalid by a provision in the will that no ecclesiastic, missionary or minister of any sect whatsoever, should ever hold or exercise any station or duty whatever in the college, nor be admitted there for any purpose. (Girard carefully explained in his will that he made this provision because, there being

a multitude of sects, he did not wish to expose the orphan children to any doctrinal or sectarian controversies.) The legislature, by Acts of March 24, 1832, P. L. 176, and April 4, 1832, P. L. 275, had provided the necessary legislation for the improvement by the city of Delaware Avenue and Water Street, and had provided further that it should be lawful for the city to enact all such ordinances and do all such acts as might be necessary and convenient for the full and entire acceptance and execution of all the bequests, trusts and provisions in Girard's will, and for the appointment of such agents as might be deemed essential to the execution of the trusts.[2]  The Supreme Court held in *Vidal et al. v. Stephen Girard's Executors,* 43 U. S. (2 Howard) 127, in an elaborate opinion by Mr. Justice STORY, that the city was legally capable of taking the bequest of the estate for the erection and support of the college upon the trusts designated in the will, and that these were valid charitable trusts and capable of being carried into legal effect.

In *Girard v. Philadelphia,* 74 U. S. (7 Wallace) 1, the decision in the *Vidal* case was affirmed, and it was held that the Consolidation Act had not changed the identity of the city so as to affect in any way its administration of the trust.  The Court stated (as will be referred to again hereafter) : "Now, if this were true [that the city had become unable to administer the trust] the only consequence would be, not that the charities or trust should fail, but that the chancellor should substitute another trustee."  In *The City of Philadelphia v. The Heirs of Stephen Girard,* 45 Pa. 9, our own Court likewise held that the trusts created

---

[2] Similar legislation, in aid of certain provisions of the will, were enacted by the Acts of February 27, 1847, P. L. 178, and April 20, 1853, P. L. 623.

in the will were valid, and pointed out that the distinction must carefully be observed between the purposes and provisions of the trust itself and any problems or difficulties arising from the mode of its administration, the former not being affected by the latter; attention was called to the important fact that Girard stated that it was his "primary object" to construct and maintain the college. In *Philadelphia v. Fox*, 64 Pa. 169, it was once again held that Philadelphia could act as a trustee to carry out the trusts under Girard's will, and that the Act of June 30, 1869, P. L. 1276, providing for the administration by a Board of Directors of City Trusts of the trusts confided to the city, the Board being "dissociated from the general government of the city," was a valid enactment. And finally, in *Girard's Appeal*, 4 Pennypacker 347, dealing with another attack on the will by Girard's heirs, it was held that they were concluded by the decree of the United States Supreme Court in the *Vidal* case, and that the establishment of the Board of Directors of City Trusts was legal and proper. All these onslaughts in both the Courts of Pennsylvania and of the United States left the Girard charity, as was said by the Court in *Benjamin Franklin's Administratrix v. The City of Philadelphia*, 2 Dist. Rep. 435, 437, as "fixed, firm, and immovable as a rock."

Coming now to the particular issue involved in the present case, it arises from the provision in the will which limits the admission into the institution to applicants possessing five qualifications:—they must be poor, they must be white, they must be male, they must be orphans (which has been construed to mean *fatherless* children), and their ages must be between six and ten; there are also preferences prescribed in regard to the birthplaces of the applicants. It is contended that the Fourteenth Amendment has made the

restriction to white children unconstitutional. The city, the Commonwealth, and two negro applicants for admission to the institution, have filed petitions for a citation on the Board of Directors of City Trusts to show cause why these applicants should not be admitted. The court affirmed the Board's refusal of the applications for admission and dismissed the petitions for a citation.

Subject, of course, to compliance with all applicable laws, it is one of our most fundamental legal principles that an individual has the right to dispose of his own property by gift or will as he sees fit; indeed this right is so much protected that a testator's directions may be enforced even though contrary to the general views of society (see, for example, *Higbee Will*, 365 Pa. 381, 75 A. 2d 599), and however arbitrary, unwise, intolerant, discriminatory, or ignoble his exercise of that right may be. He is entitled to his idiosyncracies and even to his prejudices. It was said in *Brown v. Hummel*, 6 Pa. 86, 94, 95: "It is the principle and not the individual instance that is to be considered. What private charity will next be disturbed and invaded? The will of Stephen Girard offers a conspicuous mark. . . . The most solemn act of a man's life, which is consummated by his death, is his last will and testament. By that act he makes a law for the disposition of his own property, acquired by his own industry, which, if it does not contradict the law of the country, has hitherto been considered inviolate. Shall it be so considered no longer in Pennsylvania?" Equally cogent language is to be found in many other cases in this Court, for example, in *Ervine's Appeal*, 16 Pa. 256, 265, and again in *Cauffman v. Long*, 82 Pa. 72, 77, 78, where it is said: "No right of the citizen is more valued than the power to

dispose of his property by will. No right is more solemnly assured to him by the law. Nor does it depend in any sense upon the judicious exercise of it. . . . In many instances testamentary dispositions of property seem harsh, if not unjust, . . . It is doubtless true that narrow prejudice sometimes interferes with the wisdom of such arrangements. This is due to the imperfections of our human nature. It must be remembered that in this country a man's prejudices are a part of his liberty. . . . he is entitled to the control of his property while living, and by will to direct its use after his death, subject only to such restrictions as are imposed by law." In *Dulles's Estate,* 218 Pa. 162, 163, 67 A. 49, it was said: "The fundamental law of Pennsylvania in regard to property, which ought not to require restatement as often as it does, is that the owner may do as he pleases with it provided the disposition be not to unlawful purposes, and what he may do himself he may do by agent while living, or by executor after death." In *McCown v. Fraser,* 327 Pa. 561, 564, 192 A. 674, 676, it was said: "The right to dispose of property is an incident of ownership, and a gift is none the less valid because it is undeserved or improvident." In *Wetzel v. Edwards,* 340 Pa. 121, 128, 16 A. 2d 441, 444, it was said: "No right of a citizen is more valued than the power to dispose of his property by will." In *Johnson Will,* 370 Pa. 125, 127, 128, 87 A. 2d 188, 190, it was said: "But it is and always has been the law of Pennsylvania that every individual may leave his property by will to any person, or to any charity, or for any lawful purpose he desires, . . . While it is difficult for many people to understand how or why a man is permitted to make a strange or unusual or an eccentric bequest, . . . we must remember that under the law of Pennsylvania 'a man's prejudices are a part of his liberty. He has

a right to the control of his property while living and may bestow it as he sees fit at his death".

Stephen Girard naturally must have realized that he could not create an institution large enough to furnish both sustenance and education to any and all the children of Philadelphia, Pennsylvania, New York and New Orleans who might desire to be admitted; he could provide for only a small minority of such children and accordingly he prescribed a method of selection as he had both a legal and moral right to do unless there were involved a violation of some affirmative provision of law. Admittedly there are provisions in the will which represent Girard's individual views regarding the education and rearing of the children the wisdom of which might be subject to differences of opinion, but, even if those provisions be considered peculiar, Girard was entitled to prescribe them for the operation of the institution which he was founding.

The question then, is whether the limitation in Girard's will to white children as the beneficiaries of his college or orphanage, although undoubtedly lawful at the time of the execution of his will and of his death, has become invalid as a result of the adoption of the Fourteenth Amendment which prohibited any State from denying to any person within its jurisdiction the equal protection of the laws. No such question could possibly arise in the case of a private charitable trust for the Fourteenth Amendment applies only to agencies of the State or of a municipality within the State; it is directed solely against State, not individual, action. It was said in the *Civil Rights Cases,* 109 U. S. 3, 17: "In this connection it is proper to state that civil rights, such as are guaranteed by the Constitution against State aggression, cannot be impaired by the wrongful acts of individuals, unsupported by State authority in the shape of laws, customs,

or judicial or executive proceedings." In *Corrigan v. Buckley,* 271 U. S. 323, 330, it was said: "And the prohibitions of the Fourteenth Amendment 'have reference to state action exclusively, and not to any action of private individuals.' . . . 'It is State action of a particular character that is prohibited. Individual invasion of individual rights is not the subject-matter of the Amendment.' . . . It is obvious that none of these Amendments prohibited private individuals from entering into contracts respecting the control and disposition of their own property; . . . ." In *Shelley v. Kraemer,* 334 U. S. 1, 13, it was said: "Since the decision of this Court in the *Civil Rights Cases,* 109 U. S. 3 (1883), the principle has become firmly embedded in our constitutional law that the action inhibited by the first section of the Fourteenth Amendment is only such action as may fairly be said to be that of the States. That Amendment erects no shield against merely private conduct, however discriminatory or wrongful." And in *Rice v. Sioux City Cemetery,* 349 U. S. 70, 72, it was said: "The basis for petitioner's resort to this Court was primarily the Fourteenth Amendment, through the Due Process and Equal Protection Clauses. Only if a State deprives any person or denies him enforcement of a right guaranteed by the Fourteenth Amendment can its protection be invoked." And while it would no doubt constitute "State action" for a court to enforce a restriction or discrimination invalid under the Fourteenth Amendment, the restrictive provisions themselves, as was said in *Shelley v. Kraemer,* supra (p. 13), "cannot be regarded as violative of any rights guaranteed to petitioners by the Fourteenth Amendment. So long as the purposes of those [provisions] . . . are effectuated by voluntary adherence to their terms, it would appear clear that there has been no action by the State and

560

the provisions of the Amendment have not been violated." It is perfectly clear, therefore, that private trusts for charitable purposes, not being subject to or controlled by "State action," are wholly beyond the orbit of the Fourteenth Amendment. Such trusts abound in overwhelming numbers and there can be no question as to their legality however limited be the class of their beneficiaries or whatever be the nature or basis of their restrictions; charitable trusts for limited groups, whether racial or religious, are as valid as if for all the people of the world. We have charitable trusts for ministers of various church denominations, for foreign missions, for churches, priests, Catholics, Protestants, Jews, whites, negroes, for relief of the Indians, for widows or orphan children of Masons or other fraternities, for sectarian old folks homes, orphanages, and so on. Certainly no one would contend that a donor or a testator could not establish a charity, the beneficiaries of which were to be those whom he designated,—persons of any prescribed race, creed or color, or however otherwise differentiated. The court is concerned only with the legal right of such selection by a donor or testator and not with whatever illiberalism he may display in his exercise of the right.[3]

The question here involved finally narrows down, then, to the contention of the petitioners that the trust for the orphanage or college created in Girard's will is not a *private* trust, but that it comes under the prin-

[3] The fact that a charity is restricted in its beneficiaries to a specific religious group does not make it any the less a "purely public charity" entitling it to tax exemption under the laws of the Commonwealth: *The Burd Orphan Asylum v. The School District of Upper Darby*, 90 Pa. 21. This question, however, is not involved in the present case; the Girard College has been properly exempt from taxation since its creation.

ciple of "State action" within the compass of the Fourteenth Amendment because of the fact that it is the City of Philadelphia which is the trustee appointed by Girard and which has ever since administered the trust. In considering the question thus raised it must be immediately borne in mind that we are not dealing here with a racial discrimination created by a *city ordinance* as in *Buchanan v. Warley,* 245 U. S. 60, or *Harmon v. Tyler,* 273 U. S. 668, or *Richmond v. Deans,* 281 U. S. 704, but by a private individual disposing of his own property. It is true that Girard appointed the City of Philadelphia as the trustee to administer the trust according to the terms of his will, but he certainly did not intend thereby to empower it to conduct such administration in its *public or governmental capacity,* or to bring into play any of its *proprietary* rights since it is merely the title holder of Girard's property and not its beneficial owner. As a *trustee* it was to act and could act only in a *fiduciary* capacity, exercising no State or governmental function or power in the slightest degree, but being limited to the same rights, powers and duties, no more and no less, as those of any private individual or trust company acting as trustee. If it were to be held that the city was acting in a public or governmental capacity instead of merely as a fiduciary, and therefore was engaged in "State action," it could legislate; it could change the plans, structure and terms of the entire will; it could provide for co-education instead of the beneficiaries being limited to males; it could prescribe a different age limit instead of the children being confined to those between six and ten years of age; it could provide that not only orphans but *all* children should enjoy the benefit of the charity; it could, in short, assume to exercise the same complete, unrestricted control over the college as if it were a

562

*public* institution. In fact the college is solely responsible for its own policies and management. Its employes are not employes of the city but of the trust estate. All provisions of the will show that it was not intended to be a public school; indeed, it is not merely a school at all but what Girard himself called in a codicil to his will, an "Orphan Establishment," a home where the fatherless boys eat, sleep, study and live together, enjoying the testator's bounty which provides for them not only an education but also lodging, board, clothing and all the necessities of life. The situation, therefore, is not to be confused with the so-called de-segregation cases which dealt with public schools where no discrimination in respect to race, creed or color, as the United States Supreme Court has decided, is permissible under the Fourteenth Amendment. Girard College is a comparatively large institution, but no different legal principles apply to it for that reason than to the smallest of private schools. It is erected on land owned by Girard and the buildings were constructed with his own funds (cf. *Reuben Quick Bear v. Leupp, Commissioner of Indian Affairs,* 210 U. S. 50, where the Commissioner was allowed to contract with a sectarian mission for the education of Indian pupils supported by trust funds belonging to their own tribe.) The college has been supported and maintained for now over a century by Girard's estate; not a penny of State or city money has ever gone into it, no taxpayer has ever been called upon to contribute to it; true, it is exempt from local taxation, but so are all other charities even

---

[4] In *Kerr v. Enoch Pratt Free Library of Baltimore City,* 149 F. 2d 212, the library there involved was given by the donor to the city, which owns and almost entirely maintains it on city-owned land; it is now the public library of Baltimore. Moreover no violation of any provision of the donor was involved in that case.

though restricted as to their beneficiaries and managed by private trustees. It is contended that, because Girard's will provided that the funds of the trust should be held and invested by the city treasurer and that an annual financial accounting should be presented to the legislature, this pointed to a public institution, but this argument loses sight of the fact that the will provided that none of the monies of the trust were at any time to apply to any other purposes than those prescribed by the testator and that separate accounts distinct from any other accounts of the city should be kept by it; it must also be remembered that the city in its own right was a secondary beneficiary of part of Girard's residuary estate, so that it had an independent interest of its own to protect, wholly apart from its status as fiduciary. Petitioners point out that two of the provisions of Girard's will have in fact been disregarded by the courts, the one, that no part of his real estate in Pennsylvania should ever be sold but should be rented out from time to time on leases not exceeding five years. It is true that there were some sales made under the authority of the Orphans' Court but only because the income of the trust had shrunk to a point where the college could not be efficiently maintained and therefore the sales were the only recourse open in order to preserve the purposes of the trust; this was purely an administrative matter, sanctioned by law, and involving no change or violation whatever of any of the substantive provisions or objects of the trust, and the same is true of the authority given by the court to execute leases for fifteen years of certain mine properties, it having been found impossible to secure good tenants on shorter term leases.

By the Act of June 30, 1869, P. L. 1276, the administration of all charitable trusts confided to the

City of Philadelphia was thenceforth to be in the charge of a board composed of fifteen persons, including the mayor of the city, the presidents of the councils, and twelve other citizens appointed by certain judges—now by the judges of the Court of Common Pleas of the County of Philadelphia. From that time on the Girard trust estate, as well as all the other charitable trusts of which the city is the trustee, has been managed exclusively by this Board. The Act was upheld as to its validity in *Philadelphia v. Fox*, 64 Pa. 169, where the policy it represented was described (p. 183) as "having such a board dissociated from the general government of the city". Thus the administration of the city's fiduciary duties was completely divorced from that of its ordinary governmental functions.' That the framers of the Philadelphia Home Rule Charter and all the people of the city who by their vote adopted it in 1951 so understood this separation of the Board of Directors of City Trusts from any connection with the governmental powers of the city is shown by the fact that the Charter provides, section A-100, that it should "not apply to the Board of Directors of City Trusts and to any institutions operated by it," the annotation thereto of the Charter Commission being that "The Board of City Trusts is generally not dealt with by the Charter *to protect its special status as a trustee*." In other words, the Charter, which is comprehensive and all-embracing in its provisions for the government of the City of Philadelphia, expressly excludes the Board of Directors of City Trusts as a part or arm of that government and completely dissociates it in line with the statement in the *Philadelphia v. Fox* case above quoted.[5] The treasurer

---

[5] Likewise the Act of June 25, 1919, P. L. 581, to provide for the better government of the City of Philadelphia, did not include

of the city serves as treasurer of the board and the mayor and president of city council were made members of the Board obviously because, as hereinbefore stated, the city itself, as a secondary beneficiary of the trust estate, has an interest in the management and protection of its funds; the Board must account, not to the city government, but to the Orphans' Court for the performance of its duties as trustee, the same as any other trustee (*Wilson, Mayor v. Board of Directors of City Trusts*, 324 Pa. 545, 188 A. 588). It is of interest to note that if the city itself had considered the Board to be an agency of its public government and subject to its control it could, and no doubt would, have exercised its resulting authority by directing the Board to admit these applicants to the college, instead of which, recognizing that it was merely a fiduciary, it petitioned the Orphans' Court for that purpose. And it is further to be observed, in that same connection, that the Board filed an Answer to the city's Petition, thus evidencing the complete severance between the city in its ordinary municipal or governmental capacity and the Board of Directors of City Trusts administering the trusts confided to the city as trustee.

The City of Philadelphia has been appointed at various times during a period of over two hundred years as trustee of many charitable trusts in addition to that created by Stephen Girard; they are said to number 89 in all at this time, and it is wholly impossible to conceive that the donors and testators had the slightest idea in appointing the city as a trustee of their charitable trusts that it could ever be contended

---

the Board of City Trusts as a part of the city's governmental structure.

that they were thereby subjecting their trusts to the governmental powers of the city and to the danger of their trusts being thereby invalidated or impaired which would not have been the case had they appointed a trust company or an individual as trustee. It would seem entirely clear, viewed from any and all angles, that the administration of the Girard trust by the Board of Directors of City Trusts does not in the slightest degree represent "State action" which would bring the present situation within the ambit of the Fourteenth Amendment.

But finally, even if the Board of Directors of City Trusts *were* deemed to be engaged in "State action" in the administration of the Girard trust, petitioners would nevertheless not be entitled to the remedy they seek. If the city, because bound in its public or governmental actions by the inhibition imposed upon it by the Fourteenth Amendment, cannot carry out a provision of Girard's will in regard to the beneficiaries of the charity as prescribed by him, the law is clear that the remedy is, not to change that provision, which, as an individual, he had a perfect right to prescribe, but for the Orphans' Court, which has final jurisdiction over the trust which he created, to appoint another trustee. It is hornbook law, pronounced over and over again by the decisions of this court and presumably by those of all other jurisdictions, that, as stated in *Girard v. Philadelphia*, 74 U. S. (7 Wallace) 1, 13: "Now, if this were true [that the city could not act as trustee] the only consequence would be, not that the charities or trust should fail, but that the chancellor should substitute another trustee." Already in the first attack on the trust the Supreme Court in *Vidal et al. v. Stephen Girard's Executors*, 43 U. S. (2 Howard) 127, 188, had said: "It is true that, if the trust be repugnant to, or inconsistent with the proper

purposes for which the corporation [here the City of Philadelphia] was created, that may furnish a ground why it may not be compellable to execute it. But that will furnish no ground to declare the trust itself void, if otherwise unexceptionable; but it will simply require a new trustee to be substituted by the proper court, possessing equity jurisdiction, to enforce and perfect the objects of the trust." The incompetency of a trustee does not destroy the trust nor affect its validity or enforceability. No bequest or devise for a charitable use is void or in any manner impaired because given to a person or corporation incapable, for any reason, of acting as trustee or carrying out its terms; in such a case it is for the court to appoint a trustee to administer its provisions: *Frazier, Trustee v. St. Luke's Church,* 147 Pa. 256, 23 A. 442. It was stated in the opinion in that case (p. 260, A. p. 442) that the 10th section of the Act of April 26, 1855, P. L. 331, that "no disposition of property hereafter made for any religious, charitable, literary or scientific use, shall fail for want of a trustee, . . . but it shall be the duty of the orphans' court, or court having equity jurisdiction in the proper county, to supply a trustee, . . ." was "merely declaratory of the law as it had existed and been enforced by the courts of chancery in England for hundreds of years." In *Toner's Estate,* 260 Pa. 49, 54, 55, 103 A. 541, 543, it was said: "It is a cardinal maxim in the courts of chancery, upon this subject, that a trust will not fail for want of a [faithful] trustee," citing many cases. In *Abel, Trustees v. Girard Trust Company, Trustee,* 365 Pa. 34, 40, 41, 73 A. 2d 682, 685, it was said: "It is unnecessary to consider whether the Association, chartered under the Act of 1874, April 29, P. L. 73, 15 PS 1 et seq., had the power and authority to act as trustee of a charitable trust. The familiar rule is that a charitable

trust will not fall for want of a trustee," citing many authorities.

Realizing, as they must, that their attempt to establish that the City of Philadelphia cannot, by reason of the Fourteenth Amendment, continue to carry out the provisions of the Girard will in reference to the prescribed beneficiaries of the trust would, even if successful, be a Pyrrhic victory because it could result only in another trustee being appointed for that purpose, petitioners argue that the limitation of the beneficiaries of the "Orphan Establishment" to white orphan children was a relatively unimportant matter in Girard's mind, and that his "dominant" purpose was that the City of Philadelphia should be the trustee. Not only is this, at best, mere speculation, but the most casual consideration of the terms of the will shows that the exact opposite is the truth. Who can tell better than Girard himself what his "dominant" purpose was? In his will he said, "I am *particularly desirous* to provide for such a number of poor male white orphan children, as can be trained in one institution, a better education as well as a more comfortable maintenance than they usually receive from the application of the public funds". And he further said, after speaking of his devotion of the fund to the prosperity of the city, that this was to take place only "after providing for the College as hereinbefore directed, *as my primary object."* His *secondary* objects, as he stated them, were the improvement of the city's police force, the property and general appearance of the city, and the diminution of the burden of taxation. He provided that even if the city should violate any of the conditions of the will the income from his real estate in the City of Philadelphia was nevertheless to be forever applied to maintain the college. His voice therefore, on this point, speaks from the grave. Indeed, if specula-

tion were to be indulged in, it is obvious that he wished the institution he was creating to be perpetual,—in fact he says so,—and that therefore he required a perpetual trustee, but at that time there were no trust companies, such as those with which we are now so familiar, existing in Philadelphia.[6] Accordingly, if he wanted, as he undoubtedly did, to obtain an immortal trustee, he had no other resource but to choose the City of Philadelphia. Incidentally, appellants have apparently not been able to find any case—they have cited none—where the identity of the named trustee was held to be more important than that of the beneficiaries of the trust as provided in the deed or will.

Petitioners make much in their argument of the proposition that the doctrine of cy pres ought to be applied in this case by omitting the word "white" in the will. As previously stated, they belittle the importance in Girard's mind of this provision, claiming that the ony reason for it was that at the time he executed his will negroes were slaves and therefore it never occurred to him that they could or should be admitted into such an orphanage or educational institution. However, slavery had been abolished in Pennsylvania by the Act of March 1, 1780, 1 Sm. L. 492, and there were said to be at that time 15,000 negroes in Philadelphia who were free, not slaves. There is no need whatever in the present case for the application of the doctrine of cy pres, because that doctrine applies only if it has become impossible or impracticable to carry out the objects of a trust; here there is no such situation for the trust can be enforced according

---

[6] James G. Smith, in his book on "Trust Companies in the United States," speaks (p. 233) of the age-long "search for a continuous trustee."

to its literal terms as it has been for well over a hundred years. To continue to execute it in compliance with the exact directions of Girard's will has not become either impossible or impractical, nor, as has been pointed out, illegal. There is no shortage of poor white male orphans between the ages of six and ten; on the contrary there are more qualified applicants than can be accommodated. To sanction a change of the express terms of the will of Stephen Girard, in which he exercised his inalienable right to declare who the beneficiaries of his charity were to be, would, in the opinion of the court, be a wholly unwarranted and improper decision, unjustified by any principle of applicable law.

Decrees affirmed, each of the parties to bear his or its own costs.

CONCURRING OPINION BY MR. JUSTICE BELL:

Stephen Girard left (most of) his enormous estate to establish a perpetual orphan home and college for "poor white male orphans". I fully agree with everything that Chief Justice STERN has said in his exceptionally able opinion. However, since appellants, in order to convert a private charitable orphanage establishment into a publicly owned and publicly sustained public school, i.e., "a segregation case", have distorted the plain language and the clear meaning of Girard's will, as well as the principles and legal effect of numerous authorities, I deem it wise to further analyze and to refute more comprehensively and in greater detail their conjectural, as well as their plausible, but unsound contentions.

The two principal and very important questions raised by the record and the six voluminous briefs filed

in this appeal are: What was Girard's dominant intent and can it be lawfully carried out?

Two young colored male orphans, between the ages of six and ten years, sought admission to Girard College. There are approximately 1137 poor white male orphans housed, fed, clothed, maintained, instructed and reared each year in Girard College and the number of such applicants always has exceeded the capacity of the College. The Orphans' Court of Philadelphia County in two very able opinions, one by Judge Bolger and the other by Judge Lefever, dismissed the applications because the admission of these boys was not authorized under Girard's will.

### Girard's Will

The will of Stephen Girard, dated February 16, 1830, has become a national landmark in the history of Trusts, and Girard College, which was the heart and soul of his thirty-two page will, has become an admired institution throughout our Country.

Stephen Girard prepared his will with the utmost care. He was an exceptionally able, intelligent man, and he had the advice of one of the leading lawyers of his time. The evidence shows that they shut themselves in a room and discussed the proposed will and its contents for five weeks. In his will Girard specified in lengthy and minute detail how he wished the College to be built and maintained, and the purpose to which it was to be devoted. He said as clearly as the English language will permit that this was to be a College and a Home for "poor white male orphans" who were to be admitted between the ages of six and ten and remain until they respectively arrive at between fourteen and eighteen years of age. He prescribed their food, their dress, their educators, their instruction in various branches of education, their se-

clusion and restraint from the rest of the world, as well as from their parents, clergymen and priests, and he specifically said that the provisions for the College were "my primary object".

If any language is clear and plain and unmistakable as to who should be admitted to the College, Girard's language is clear and plain and unmistakable. He was creating an "orphanage establishment", a home and college not for poor girls and boys, not for orphan boys, not for red or brown or yellow or black orphans, not even for all orphans—he created in the clearest imaginable language an orphan home and college for "poor white male orphans".

Girard first made a gift to the Pennsylvania Hospital of $30,000. to pay to his "black" woman, Hannah, to whom by his will he gave her freedom, the sum of $200. a year, and the balance to be used for the sick in the Hospital. He then gave the sum of $20,000. to the Pennsylvania Institution for the Deaf and Dumb for the use of that Institution. He then gave $10,000. to The Orphan Asylum of Philadelphia for the use of that Institution. He did not limit these gifts to white people. He then gave $10,000. to the Comptrollers of the Public Schools for the City and County of Philadelphia for the use of the schools upon the Lancaster system. He then bequeathed to the Mayor, Aldermen and Citizens of Philadelphia the sum of $10,000. to distribute the income among poor white housekeepers and roomkeepers of good character residing in the City of Philadelphia. He then gave $10,000. to the Society for the relief of poor and distressed masters of ships, their widows and children. He then gave $20,000. to the Masonic Loan in trust for the Grand Lodge of Pennsylvania. He then gave $6,000. for the purchase of land, one part thereof for poor white male children and the other part for poor white female chil-

dren of Passyunk Township. He then made very small pecuniary gifts and devises to members of his family and friends. He then made a gift to his captains and to those who were bound to him by indenture as apprentices or servants. He then devised one-third of his real and personal estate near Washita in the State of Louisiana to the Corporation of the City of New Orleans, for such uses and purposes as the Corporation may consider most likely to promote the health and general prosperity of the *inhabitants* of the City of New Orleans.

In Paragraph XX he said: "And whereas I have been for a long time impressed with the importance of educating the poor, and of placing them by the early cultivation of their minds and the development of their moral principles, above the many temptations, to which, through poverty and ignorance they are exposed; and *I am particularly desirous to provide for such a number of poor male white orphan children, as can be trained in one institution,** a better education as well as a more comfortable maintenance than they usually receive from the application of the public funds: And whereas, together with the object just adverted to, I have sincerely at heart the welfare of the city of Philadelphia, and, as a part of it, am desirous to improve the neighborhood of the river Delaware, so that the health of the citizens may be promoted and preserved, and that the eastern part of the city may be made to correspond better with the interior: Now, I do give devise and bequeath all the residue and remainder of my real and personal estate of every sort and kind and wheresoever situate (the real estate in Pennsylvania charged as aforesaid) unto 'The Mayor, Aldermen and citizens of Philadelphia their succes-

* Italics throughout, ours.

sors and assigns in trust to and for the several uses intents and purposes hereinafter mentioned . . .' "

He provided in the remainder of Paragraph XX that the rents, issues and profits should be used to keep that part of the City constantly in good repair.

We then come to the most pertinent provision of the will, Paragraph XXI. In this paragraph testator gave $2,000,000 of the residue of his personal estate "in trust . . . [to erect] as soon as practicably may be, in the centre of my square of ground between High and Chestnut streets and Eleventh and Twelfth streets,* in the city of Philadelphia (which square of ground I hereby devote for the purposes *hereinafter stated, and for no other,* forever) a permanent College, with suitable out-buildings, sufficiently spacious for the residence and accommodation of at least three hundred scholars, and the requisite teachers and other persons necessary in such an institution as I direct to be established; . . .". He provided in very minute detail (through seven pages) the design, the material and the manner in which the buildings were to be erected. When the college and appurtenances shall have been constructed and properly furnished, he directed that the balance of $2,000,000., and subsequently the remainder of his residuary personal estate shall be applied to maintain the said college according to his directions. "3.** *As many poor white male orphans, between the ages of six and ten years,* as the said income shall be adequate to maintain, shall be introduced into the college as soon as possible; and from time to time as there may be vacancies, or as in-

---

* By his codicil dated June 20, 1831, he changed the situs of his "Orphan Establishment" to its present location.

** 1 and 2 dealt with instructors.

creased ability from income may warrant, others shall be introduced."

In Paragraph XXII of his will Girard gave $500,-000. for the repair and improvement of the streets of Philadelphia fronting on the River Delaware and of certain buildings therein, and for the widening and paving of Water Street.

In Paragraph XXIII of his will he gave to the Commonwealth of Pennsylvania $300,000. for internal improvement by canal navigation.

In Paragraph XXIV of his will Girard provided that the remainder of his residuary personal estate shall be applied:

"1.  To the further improvement and maintenance of the aforesaid College as, directed in the last paragraph of the XXIst clause of this will.

"2.  To enable the Corporation of the City of Philadelphia to provide more effectually than they now do, for the security of the persons and property of the inhabitants of the said city, by a competent police, . . . .

"3.  To enable the said corporation to improve the city property, and the general appearance of the city itself; and, in effect to diminish the burden of taxation, now most oppressive especially on those, who are the least able to bear it . . . .

"To all which objects, the prosperity of the City, and the health and comfort of its inhabitants, I devote the said fund as aforesaid, and direct the income thereof to be applied yearly and every year for ever—*after providing for the College as hereinbefore directed, as my primary object.*"

Girard then provided that if the City knowingly and wilfully violated any of his testamentary conditions, he bequeathed the said remainder to the Com-

monwealth of Pennsylvania for the purposes of internal navigation *"excepting, however,* the rents issues and profits of my real estate in the City and County of Philadelphia, *which shall forever be reserved and applied to maintain the aforesaid College,* in the manner specified in the last paragraph of the XXIst clause of this will".

Testator then provided that if the Commonwealth failed to apply his bequests to the uses and purposes he mentioned, he devised the remainder to the United States of America for the purpose of internal navigation and no other—"the rents aforesaid *always excepted and reserved for the College* as aforesaid." First and foremost was always the College!

It is impossible for any unbiased person to read Girard's will without being convinced that *his specific, as well as his primary and dominant and paramount intent,* was to provide a college and orphanage home for "poor white male orphans". Girard not only *specifically* said so twice in his residuary trust provisions or bequests, but in all gifts or provisions pertaining to his residuary estate, the College was placed above everything else as the primary object of his heart and bounty. The language describing and defining the class of beneficiaries, namely, "poor white male orphans" is so clear, plain, certain, unambiguous and unmistakable, that it seems incredible that it is now contended that "white" does not mean "white"—it means white and black and yellow and brown.

Before discussing the many cases which for a period of over 100 years have sustained Girard's testamentary orphanage establishment for poor white male orphans, we shall dispose of those contentions of appellant which are so far-fetched as to be entirely devoid of merit.

Appellants contend that the City of Philadelphia was the primary object of testator's bounty. A study, nay a reading, of Girard's will quickly demonstrates that there is absolutely nothing in the will to support this theory, and that it is completely contrary to what Girard specifically and repeatedly said therein.

Appellants contend that Girard was interested in and wanted to aid the City of Philadelphia and the poor people of Philadelphia and therefore he must have wanted white and black orphans *and all poor people* of Philadelphia admitted to this orphanage establishment. Girard in several paragraphs of his will not only said he was interested in and wanted to aid the City of Philadelphia and the poor people thereof, but he specifically did exactly that in a number of bequests in his will which have been hereinabove recited. Of course it is a non sequitor to say that because he wanted to aid the City and the poor, he must therefore have wanted all orphans, or black and white orphans, or all poor people of Philadelphia admitted to the college, *when he specifically said something entirely different.*

Perhaps the most far-fetched and fantastic contention which was vigorously urged upon us was that if Girard had foreseen the Civil War and the subsequent Constitutional Amendments, particularly the Fourteenth Amendment, and certain recent decisions of the Supreme Court of the United States, and had lived in these modern times when colors and races intermingle and fraternize, he would have desired Girard College to be a college for all poor male orphans (or for all the poor people of Philadelphia) without distinction for race, creed or color.* These conjectures

---

* It was even argued that you could not be a good American citizen unless you went to a school composed of whites and colored.

or contentions are merely wishful thinking or fantasies; none of them have any sound basis or merit whatsoever. Respected men and women, as well as eccentric people, sometimes make sound and sometimes eccentric wills. Courts, heirs and excluded beneficiaries often wish (1) they could change or delete clear and plain and specific language, or (2) rewrite a will to expand or change the testator's bounty in order to conform to what they believe would be fairer or wiser, or to conform to what they think the testator would have said if he had foreseen the existing facts and circumstances. But that is not and never has been the law of Pennsylvania!

". . . it is and always has been the law of Pennsylvania that every individual may leave his property by will to any person, or to any charity, or for any lawful purpose he desires, unless he lacked mental capacity, or the will was obtained by forgery or fraud or undue influence, or was the product of a so-called insane delusion. While it is difficult for many people to understand how or why a man is permitted to make a strange or unusual or an eccentric bequest, especially if he has children or close relatives living, we must remember that under the law of Pennsylvania, ' "a man's prejudices are a part of his liberty. He has a right to the control of his property while living, and may bestow it as he sees fit" at his death: McCown v. Fraser, 327 Pa. 561, 192 A. 674; Cauffman v. Long, 82 Pa. 72.' ": *Johnson Will*, 370 Pa. 125, 87 A. 2d 188.

In *Cannistra Estate*, 384 Pa. 605, 121 A. 2d 157, this Court said: "No rule regarding wills is more settled than the great General Rule that the testator's intent, if it is not unlawful, must prevail! This is the reason why so many cases continually proclaim that the pole star in the construction of every will is

the testator's intent. Moreover, 'The testator's inten-
tion must be ascertained from the language and scheme
of his will: "it is not what the Court thinks he might
or would have said in the existing circumstances,
or even what the Court thinks he meant to say, but
what is the meaning of his words": Britt Estate, 369
Pa. [450, 454, 87 A. 2d 243]': Sowers Estate, 383 Pa.
566, 119 A. 2d 60. . . .

"The language of Mr. Justice STEARNE, speaking
for the Court in Borsch Estate, 362 Pa. 581, 67 A. 2d
119, is particularly appropriate: 'We said, in Stoffel's
Estate, 295 Pa. 248, 145 A. 70, P. 251: "One possessed
of testamentary capacity, who makes a will in Penn-
sylvania, may die with the justifiable conviction that
the courts will see to it that his dispositions, legally
made, are not departed from by those charged with the
duty of performance, . . ." ' This always has been and
unless changed or modified by the legislature, should
continue to be the wise salutary policy of the Courts
of Pennsylvania regarding wills."

Gifts to charity, outright or in trust, are favored
by the law of Pennsylvania: *Daly's Estate*, 208 Pa.
58, 66, 57 A. 180; *Jordan's Estate*, 329 Pa. 427, 429,
197 A. 150; *McKee Estate*, 378 Pa. 607, 108 A. 2d 214.
We have sustained charitable trusts for every con-
ceivable charity—sectarian churches, hospitals and
homes of all denominations, charitable gifts for de-
nominational or sectarian ministers, for priests, for
free masons, for aged couples, for aged Israelites, for
widows, for all classes of society, and even for ag-
nostic societies. Gifts to private schools and col-
leges have been sustained as valid and constitutional.
Cf. *Pierce v. Hill Military Academy*, 268 U. S. 510;
*Craig Estate*, 356 Pa. 564, 52 A. 2d 650; *Donohugh's
Appeal*, 86 Pa. 306; *Hill School Tax Exemption Case*,

370 Pa. 21, 87 A. 2d 259; *Philadelphia v. Women's Christian Ass'n*, 125 Pa. 572, 17 A. 475; *Episcopal Academy v. Phila.*, 150 Pa. 565, 25 A. 55.

In *Craig Estate*, 356 Pa., supra, testatrix's gift of $25,000. to the Trustees of the Central Presbyterian Church, to be retained as a permanent fund and the income used in keeping the church properties in order and for such other church purposes as the trustees may direct, was sustained even though the church dissolved and a new or substituted trustee was appointed by the Orphans' Court. The Court said: "Where a gift is made directly to a charitable or religious body for purposes which are within the powers of the corporation, it is a trustee for itself, and holds for the purposes specified in the gift. It is, however, a trust in the sense that the fund does not merge into the general property of the corporation but remains under the jurisdiction of a court of Equity. Equity has power to define the trust and to restrain any violation of it. See Wilson v. Board of City Trusts, 324 Pa. 545. . . .

"In Pennsylvania the control and disposition of church property is subject to the rules and regulations of the religious body to which the church belongs: Act of June 20, 1935, P. L. 353, 10 PS 81; Canovaro v. Brothers of St. Augustine, 326 Pa. 76; but both that act and the decision cited recognize that donations and gifts in trusts lawfully established by wills or reserved in writing must be preserved and given due effect; an all-sufficient reason being given in Brown v. Hummell, 6 Pa. 86, 95, namely, that the hand of private benevolence be not stayed and checked by the conviction that the will of the donor may not be preserved."

In *Pierce v. Hill Military Academy*, 268 U. S., supra, the Court said (page 514) : "This Court, like the

court below, must know that the true purpose of the act, as well as its plain and intended practical effect, was the destruction of private primary, preparatory and parochial schools; for they certainly could not survive the denial of the right of parents to have their children thus educated in the primary grades. Such drastic and extraordinary legislation is a portentous innovation in America. Private and religious schools have existed in this country from the earliest times. Indeed, the public or common school, as we know it today, dates only from 1840. For generations all Americans—including those who fought for liberty and independence in the eighteenth century, and who drafted the Declaration of Independence, the Northwest Ordinance of 1787, and the Constitution of the United States—were educated in private or religious schools, and mostly the latter. Perhaps no institution is older or a more intimate part of our colonial and national life than religious schools and colleges, both Catholic and Protestant. The private and religious schools have been the laboratories in which educational methods have been worked out and pedagogic progress accomplished from the very beginning of our history. Out of them have developed, or to them is due, our greatest colleges and universities, the most important of them to this day being private or religious institutions. In more recent times commonwealth colleges and universities have grown up. The legislation before the court manifestly carries within itself a threat, not merely to the private elementary and preparatory schools which it now practically proscribes, but to every private or religious preparatory school and every private or religious college or university in the land."

The right to dispose by will of one's property is one of the most treasured rights of an American citizen,

and if the will does not violate the law, not even the legislature can pervert or destroy a man's validly executed will: *Brown v. Hummel*, 6 Pa. 86, 95.*

Appellants argue that Girard's will discriminates against negroes. It could just as readily be argued, and it would be just as irrelevant, that it similarly discriminates against all girls—white, red, yellow, brown and black—against white boys who are not orphans,—against white boys who are not poor,—as well as against all poor boys who are not born in Philadelphia. The fact that a testator prefers to leave his money by will, or limit and restrict his testamentary bequests to some of his children, or to some of his relatives instead of to all of his children, or all of his relatives, or to a church or charity instead of to his relatives, or for people suffering with certain diseases, or for aged Protestants, or "for the poor of the German Lutheran Congregation", or for the "Roman Catholic Church of Saint Coleman for its own uses and purposes", or to a named Catholic priest or church for the poor of that parish, or for a named sectarian Orphanage, or for a sectarian or denominational church or home or charity or for any charitable purpose, does not constitute discrimination in its legal meaning. In *Wharton Appeal*, 373 Pa. 360, 369, 96 A. 2d 104, the Court said: "A testator . . . may exclude any one whom he wishes, except a surviving spouse. The reason for the exclusion need not be stated by testator and will not be passed upon by a court."

It is indisputable that nearly every charitable bequest excludes more than half of the public, but it

---

* See also: *Crawford Estate*, 362 Pa. 458, 67 A. 2d 124; *Warden Trust*, 382 Pa. 311, 314-315, 115 A. 2d 159; *McKean Estate*, 366 Pa. 192, 77 A. 2d 447; *Borsch Estate*, 362 Pa. 581, 67 A. 2d 119; *Willcox v. Penn Mutual Life Insurance Co.*, 357 Pa. 581, 55 A. 2d 521.

does not for that reason cease to be a valid charitable gift, or be unconstitutional, or become the property of the State or Municipality in its governmental capacity.

### A CENTURY OF INTERPRETATION BY PARTIES AND COURTS

Not only is Girard's will crystal clear that he wished, meant, said and intended that only "poor white male orphans" should be admitted to Girard College, but that very interpretation and construction has been placed upon this testamentary provision of his will for over 100 years (1) by those who have administered and managed the trust estate for Girard College (which now amounts to approximately $98,000,000.), and (2) by the Supreme Court of the United States, and (3) by the Supreme Court of Pennsylvania, and (4) by the lower Courts of this Commonwealth, and (5) by the present appellant—the City of Philadelphia.

It is very important to note that this is a privately founded and privately endowed charity—an "orphanage establishment", a college and home for orphans— *poor white male orphans.* Girard College is not and never was a government owned piece of real estate or building or public college; it was not constructed and it is not and never was maintained by the State, the City or its agents from tax money or public funds, nor has the public as such ever been admitted. Girard College was built on land owned by Girard, with Girard's own money, and every dollar of its construction, maintenance and upkeep, and the salaries or wages of its teachers and employes, and the food, clothing, lodging maintenance and education of its boys have been paid by and from the private funds of a private citizen, Stephen Girard. We repeat, neither the City of Philadelphia nor the Commonwealth of Pennsylvania nor the Government of the United States

584

have ever paid or contributed one cent toward the construction or maintenance of the College, or the salaries of its teachers, or the feeding, clothing, maintenance or education of any of the orphan boys who live and study therein.

Perhaps equally important, Girard College was never administered by the City in its governmental or sovereign capacity. It was administered originally by the Mayor, Aldermen and Councils, and subsequently by an independent agency created by the Legislature *solely in the capacity of a fiduciary or trustee governed, bound and limited by the directions and provisions of Girard's Will.**

Today neither the Mayor of Philadelphia nor any of the departments under him, nor City Council administers, manages or operates the orphanage known as Girard College in any capacity whatsoever. Today under the Philadelphia Home Rule Charter adopted April 17, 1951, effective January 7, 1952, neither Girard College nor its Board of Directors of City trusts are included within the City government; on the contrary, the Board of Directors of City Trusts, which administers Girard's testamentary trust known as Girard College, is specifically excluded from the City Charter. Section A-100 of the Philadelphia Home Rule Charter provides: "Except as otherwise specifically provided, this charter shall not apply to the Board of Directors of City Trusts and to any institutions operated by it." And the annotation thereto states: "4. The Board of City Trusts is generally not dealt with by the Charter to protect its special status as a trustee."

---

* One of the basic fallacies of appellants is their failure to recognize the distinction between the City's actions in its governmental capacity and its actions in its capacity as a fiduciary or trustee.

The Girard Trust is administered and managed by a Board of Directors of City Trusts which is composed of 14 members: Five leading business men, four leading lawyers, two leading bankers, a doctor, and ex-officio, the Mayor of Philadelphia and the President of City Council. The Board of Directors is not selected or elected or appointed by the Mayor or by City Council or by the citizens of Philadelphia—it is selected and appointed by the Judges of the Courts of Common Pleas of Philadelphia County and is, we repeat, a separate, independent entity which was specifically excluded from the Philadelphia City Charter.

When the City of Philadelphia administered Girard College, it administered it in the capacity, not of a government or sovereign dealing as it wished with its own public property, but *solely as a fiduciary trustee to carry out the directions of Girard's will by which it was limited and bound.* It was compelled under Paragraph XXIV of Girard's will to keep an account of his estate separate and distinct from all other monies and accounts of the City; it had to furnish annually to the Legislature an account so that a Committee of the Legislature could examine it and see that his estate was applied only to the purposes set forth in his will and that his "intentions had been fully complied with". The reason for Girard's appointment of the City as trustee is obvious. When Girard made his will in 1830 he naturally desired a perpetual trustee to carry out the wonderful and perpetual charitable orphanage and college he so earnestly desired and so minutely prescribed. Sitting in Girard's armchair, as we must do, to look at the attendant and surrounding circumstances,* Girard, an outstanding banker, must

---

* *McFadden Estate*, 381 Pa. 464, 112 A. 2d 148; *Wright Estate*, 380 Pa. 106, 110 A. 2d 198; *Edmunds Estate*, 374 Pa. 22, 97 A. 2d

have known that there was not a single trust, company in the City of Philadelphia** to act in the capacity of a perpetual trustee. That is, we repeat, the obvious reason why the City was appointed trustee.

A municipality, if it is authorized to do so by the Legislature, can act (1) in its sovereign or public or governmental capacity; (2) in its private or proprietary capacity, in which event it is considered a separate entity acting for its own private purposes and not as a subdivision of the State: Cf. *White Oak Borough Authority Appeal,* 372 Pa. 424, 93 A. 2d 437; *Shirk v. Lancaster City,* 313 Pa. 158, 169 A. 557; *Western Saving Fund Society v. Philadelphia,* 31 Pa. 175; *Moore v. Luzerne County,* 262 Pa. 216, 105 A. 94; *Bell v. Pittsburgh,* 297 Pa. 185, 146 A. 567; *Madden v. Borough of Mt. Union,* 322 Pa. 109, 185 A. 275; *Carlisle Gas & Water Co. v. Carlisle Borough,* 218 Pa. 554, 67 A. 844; *Commonwealth v. P. R. T. Co.,* 287 Pa. 70, 134 A. 452; *Versailles Township Authority v. McKeesport,* 171 Pa. Superior Ct. 377, 90 A. 2d 581; or (3) *in a fiduciary (trustee)* capacity, in which event it, like any indi-

---

75; *Kehr Will,* 373 Pa. 473, 95 A. 2d 647; *Britt Estate,* 369 Pa. 450, 87 A. 2d 243.

** The Pennsylvania Company for Insurance on Lives and Granting Annuities, now known as The First Pennsylvania Banking and Trust Company, was incorporated in 1812, but did not acquire trust powers until 1836. The Girard Trust Company, now the Girard Trust Corn Exchange Bank, was incorporated in 1836. The Fidelity Trust Company, now the Fidelity-Philadelphia Trust Company, was incorporated in 1866. The Provident Trust Company was incorporated in 1865. The Real Estate Title Insurance Company, now known as Tradesmens' Bank and Trust Company, was incorporated as a title company in 1876 and first acquired trust powers in 1889. These were the first trust companies in Philadelphia and their importance trust-wise is further evidenced by the fact that in 1847 the Pennsylvania Company had total trust assets of only $176,000.

vidual or corporate trustee, is bound by and has only the powers and authority given it by the will or deed of trust: *Vidal et al. v. Girard's Executors*, 43 U. S. 127; *Girard v. Philadelphia*, 74 U. S. 1; *Philadelphia v. The Heirs of Stephen Girard*, 45 Pa. 9; *Philadelphia v. Fox*, 64 Pa. 169; *Philadelphia v. Elliott*, 3 Rawle 169.

Before the College was constructed, Girard's testamentary trust for the College was vigorously attacked by his heirs, but *was sustained* as a valid charitable trust by the Supreme Court of the United States in *Vidal et al. v. Girard's Executors*, 43 U. S. 127. The heirs were represented by Daniel Webster and other leading lawyers of that day. That case arose by a bill in equity to set aside Girard's testamentary trust for the College. Mr. Justice STORY said, inter alia: "The persons who are to receive the benefits of the institution he declared to be, *'poor white male orphans* between the ages of six and ten years; . . .'. The principal questions, to which the arguments at the bar have been mainly addressed, are; First, whether the corporation of the city of Philadelphia is capable of taking the bequest of the real and personal estate for the erection and support of a college *upon the trusts and for the uses designated in the will*: Secondly, whether these uses are charitable uses valid in their nature and capable of being carried into effect consistently with the laws of Pennsylvania: . . . .
. . . where the corporation has a legal capacity to take real or personal estate, there it may take and hold it *upon trust, in the same manner and to the same effect as a private person may do*. It is true that, if the trust be repugnant to, or inconsistent with the proper purposes for which the corporation was created, that may furnish a ground why it may not be compellable to execute it. *But that will furnish no ground to declare the trust itself void*, if otherwise unexceptionable; but

*it will simply require a new trustee to be substituted by the proper court,* possessing equity jurisdiction, to enforce and perfect the objects of the trust. . . . In such a case, the trust itself being good, will be executed by and under the authority of a court of equity. Neither is there any positive objection in point of law to a corporation taking property upon a trust not strictly within the scope of the direct purposes of its institution, but collateral to them; nay, for the benefit of a stranger or of another corporation. . . . We think, then, that the *charter of the city does invest the corporation with powers and rights to take property upon trust for charitable purposes,* which are not otherwise obnoxious to legal animadversion; and, therefore, the objection that it is incompetent to take or administer a trust is unfounded in principle or authority, under the law of Pennsylvania. . . .

"We are, then, led directly to the consideration of the question which has been so elaborately argued at the bar, as to the validity of the trusts for the erection of the college, according to the requirements and regulations of the will of the testator. That the trusts are of an eleemosynary nature, and charitable uses in a judicial sense, we entertain no doubt. Not only are charities for the maintenance and relief of the poor, sick, and impotent, charities in the sense of the common law, but also donations given for the establishment of colleges, schools, and seminaries of learning, and especially such as are for the education of orphans and poor scholars. . . .

"Several objections have been taken to the present bequest to extract it from the reach of these decisions. In the first place, that the corporation of the city is incapable by law of taking the donation for such trusts. This objection has been already sufficiently considered. . . .

"This objection is that the foundation of the college upon the principles and exclusions prescribed by the testator, is derogatory and hostile to the Christian religion, and so is void, as being against the common law and public policy of Pennsylvania; and this for two reasons: First, because of the exclusion of all ecclesiastics, missionaries, and ministers of any sect from holding or exercising any station or duty in the college, or even visiting the same: and Secondly, because it limits the instruction to be given to the scholars to pure morality, and general benevolence, and a love of truth, sobriety, and industry, thereby excluding, by implication, all instruction in the Christian religion."

In *Girard v. Philadelphia*, 74 U. S. 1—which was an action of ejectment where the issue was the meaning and validity of Girard's will—the Supreme Court of the United States *again* sustained the validity of Girard's testamentary trust for the orphanage college and again pointed out that the College was the primary object of his bounty. The Court said, inter alia: ". . . the attempt to restrain the alienation of the realty, being inoperative, could not affect the validity of the devise,* and that the income of the whole residuary was devoted to the three objects stated by the testator, *the college being the 'primary object,'* and that so long as any portion of this residuary fund should be found necessary for 'its improvement and maintenance,' on the plan and to the extent declared in the will, *the second and third objects could claim nothing. . . .*

". . . Now, it is admitted (for it has been so decided), that till February, 1854, the corporation was

---

* The same question is raised again in the instant case and was raised and decided adversely to the appellants in *Girard Estate*, 73 D. & C. 42.

construct Delaware Avenue and repair wharves, and (b) "to ap-

vested with a complete title to the whole residue of the estate of Stephen Girard, *subject to these charitable trusts,* and consequently, at that date, his heirs at law had no right, title, or interest whatsoever in the same. But the bill alleges that the act of the legislature of that date (commonly called the 'Consolidation Act'), which purports to be a supplement to the original act incorporating the city, has either dissolved or destroyed the identity of the original corporation, and it is consequently unable any longer to administer the trust. *Now, if this were true, the only consequence would be, not that the charities or trust should fail, but that the chancellor should substitute another trustee.* . . .

"Now, it cannot be pretended that the legislature had not the power to appoint another trustee if the act had dissolved the corporation, or to continue the rights, duties, trusts, &c., in the enlarged corporation. It has done so, and has given the widest powers *to the trustee to administer the trusts and charities according to the intent of the testator, as declared in his will.*

"The legislature may alter, modify, or even annul the franchises of a public municipal corporation,\* al-

---

\* Unless authorized by the Constitution or by an Act of Assembly, cities and municipalities are not sovereigns; they have only such powers and such rights of legislation as are authorized by the Constitution or by an Act of the Legislature. *Genkinger v. New Castle,* 368 Pa. 547, 549, 84 A. 2d 303; *Kline v. Harrisburg,* 362 Pa. 438, 68 A. 2d 182; *Commonwealth v. Moir,* 199 Pa. 534, 541, 49 A. 351; *Murray v. Philadelphia,* 364 Pa. 157, 71 A. 2d 280; *Philadelphia v. Fox,* 64 Pa. 169, 180; *Trenton v. New Jersey,* 262 U. S. 182; *Hunter v. Pittsburgh,* 207 U. S. 161; *Pittsburg's Petition,* 217 Pa. 227, 66 A. 348. This was the reason why the City of Philadelphia had Acts passed by the Legislature in 1832 and 1847 to enable it to accept the gifts made in Girard's Will, viz., (a) to will of Stephen Girard."

though it may not impose burdens on it without its consent. In this case the corporation has assented to accept the changes, assume the burdens, and perform the duties imposed upon it; and it is difficult to conceive how they can have forfeited their right to the charities which the law makes it their duty to administer. *The objects of the testator's charity remain the same,* while the city, large or small, exists; *the trust is an existing and valid one,* the trustee is vested by law with the estate, and the fullest power and authority to execute the trust.

". . . it cannot admit of a doubt that, where there is a valid devise to a corporation, in trust for charitable purposes, unaffected by any question as to its validity because of superstition, the sovereign may interfere to enforce the execution of the trusts, either by changing the administrator, if the corporation be dissolved, or, if not, by modifying or enlarging its franchises, *provided the trust be not perverted, and no wrong done to the beneficiaries.* Where the trustee is a corporation, no modification of its franchises, or change in its name, while its identity remains, can affect its rights to hold property devised to it for any purpose. *Nor can a valid vested estate, in trust, lapse or become forfeited by any* misconduct in the trustee, or *inability in the corporation to execute it,* if such existed. Charity never fails; and it is the right, as well as the duty of the sovereign, by its courts and public officers, as also by legislation (if needed), to have the charities properly administered.

"Now, there is no complaint here that the charity, *so far as regards the primary and great object of the testator,* is not properly administered; and it does not

point . . . agents . . . to carry out the . . . *trusts* created by the

appear that there now is, or ever will be, any residue to apply to the secondary objects. . . .

"1st. The residue of the estate of Stephen Girard, at the time of his death, was, by his will, vested in the corporation *on valid legal trusts, . . .*".

These cases completely answer and refute all of appellants' contentions.

The Courts of Pennsylvania have likewise repeatedly passed upon and sustained the validity of Girard's testamentary trust for this orphanage establishment or college for "poor white male orphans" and have recognized it as the primary object of his bounty.

Girard's Will first came directly before this Court* in *Soohan v. The City of Philadelphia*, 33 Pa. 9. The

---

* As early as 1846, Girard's Will had become a landmark in the realm of charitable trusts. In *Brown v. Hummel*, 6 Pa. 86, testator devised his estate to trustees to establish an orphan home for the education of poor orphans. He provided in his Will how the succeeding trustees should be chosen. The legislature attempted by Act of April 21, 1846, to require the trustees to be chosen in a manner and by persons different from that set forth by the testator. The Court declared the Act to be unconstitutional and void and said, inter alia: "If the legislature, by ex parte enactment, can alter the will of a private individual, whose will shall escape? On whose will shall the hand of legislative innovation next be laid? . . . *What private charity will next be disturbed and invaded?* The will of Stephen Girard offers a conspicuous mark. How many charities in the character of hospitals, asylums, and schools, in the state, are exposed to the same peril as the charity created by the will of George Fry? . . . If the legislature can alter one man's will, by license of the constitution, they can alter the will of every man." *If the legislature cannot alter a man's will, certainly the City, which is an agent of the legislature, cannot do so.*

In *Benjamin Franklin's Administratrix v. City of Philadelphia*, 2 D.R. page 435, the lower Court sustained a charitable gift by Franklin to the inhabitants of Philadelphia in trust to pay the income for the benefit of apprentices with gifts over thereafter. That Court, speaking of Girard's trust for the orphanage College, said: ". . . yet only a class, and that a small class of the people

Court there decided that a fatherless child is an orphan within the meaning of Girard's will and that a preference was to be given to those orphans born within the original corporate limits of Philadelphia, as laid out by William Penn, and existing at the death of the testator. Before coming to this conclusion, the Court in an elaborate opinion, pointed out that *the orphans must be poor white male orphans* between the age of six and ten years. The Court, in reviewing Girard's will, said (page 22):

"Then follow ten paragraphs in which *he directs* how his college shall be organized and managed, and *what orphans shall be admitted into it.* They must be *poor white male orphans* between the age of six and ten years, and must be bound to the corporation of the city. Priority of application to entitle to preference, all other things concurring; if more applicants than vacancies preference shall be given, 'First, to orphans born in the city of Philadelphia; Secondly, to those born in any other part of Pennsylvania; Thirdly, to those born in the city of New York (that being the first port on the continent of North America at which I arrived); and lastly, to those born in the city of New Orleans (being the first port on the said continent at which I first traded in the first instance, as first officer, and subsequently as master and part owner of a vessel and cargo).' "

---

can obtain the benefit of it. Girls are excluded; boys whose fathers are living are excluded; men and women are excluded; in short, *all but 'poor white male orphans' are excluded.* Nevertheless, it is a great charity, and withstood numerous and persistent attacks in the courts of Pennsylvania and of the United States, until now it is fixed, firm, and as immovable as a rock: Vidal v. Girard's Executors, 2 Howard, U. S. 127; Philadelphia v. Girard's Heirs, 45 Pa. 9; Girard v. Philadelphia, 7 Wallace, 1."

In *City of Philadelphia v. The Heirs of Stephen Girard*, 45 Pa. 9, the testamentary trust for the College was again attacked and sought to be voided because of (a) the provision against alienation of the real estate and (b) the provision for accumulation. This Court held that even if the subordinate provisions against alienation and accumulations were invalid, this would not destroy the validity of the testamentary trust for the college. In that case this Court once again pointed out that Girard's testamentary trust for the College had been sustained, against vigorous attacks, by the Supreme Court in *Vidal v. Girard's Executors*, 43 U. S., supra. This Court in its opinion said, pages 25-28: "In all gifts for charitable uses the law makes a very clear distinction between those parts of the writing conveying them, which declares the gift and its purposes, and those which direct the mode of its administration. And this distinction is quite inevitable, for it is founded in the nature of things. We must observe this distinction in studying Mr. Girard's will, otherwise we run the risk of inverting the natural order of things by subordinating principles to form, the purpose to its means, the actual and executed gift for a known purpose to the prescribed or vaticinated modes of administering it, that are intended for adaption to an unknown future, and of thus making the chief purpose of the gift dependent on the very often unwise directions prescribed for its future security and efficiency.

"There is no sort of difficulty in making an analysis of the relevant parts of this will in accordance with this distinction.

"It is a devise of all the residue of his real and personal estate to the city of Philadelphia, an existing corporation, in trust, *as his 'primary object,'* to

construct, furnish, constitute, and maintain the institution now known as the Girard College, and then for certain municipal purposes, not necessary to be now specified. . . .

"4. Possibly some of the directions given for the management of this charity are very unreasonable and even impracticable; but this does not annul the gift. The rule of equity on this subject seems to be clear, that when a definite charity is created, the failure of the particular mode in which it is to be effectuated does not destroy the charity, for equity will substitute another mode, so that the substantial intention shall not depend on the insufficiency of the formal intention: 7 Ves. 69; 4 Id. 329; 14 Simons 232; 17 S. & R. 91; 1 M. & W. 287.

"5. And this is the doctrine of cy pres, . . . a reasonable doctrine, by which a well-defined charity, or one where the means of definition are given, may be enforced *in favour of the general intent,* even where the mode or means provided for by the donor fail by reason of their inadequacy or unlawfulness."

Girard's Will next came before this Court in *Philadelphia v. Fox,* 64 Pa. 169. The legislature passed an Act of June 30, 1869, providing for a separate body of citizens *for the administration of trusts* vested in the city, to be known as the Board of Directors of City Trusts. The City contested the constitutionality of this Act and contended, inter alia, that the legislature could not take away the property of the municipal corporation without payment, and that every citizen of Philadelphia and every owner of property in the territorial limits in the old city of Philadelphia had a pecuniary interest in the devise of Mr. Girard. The City's contentions were rejected by this Court which, speaking through Justice SHARSWOOD, said, inter alia:

"The City of Philadelphia is beyond all question a municipal corporation, that is, a public corporation created by the government for political purposes, and having subordinate and local powers of legislation: 2 Kent's Com. 275; an incorporation of persons, inhabitants of a particular place, or connected with a particular district, enabling them to conduct its local civil government: Glover Mun. Corp. 1. It is merely an agency instituted by the sovereign for the purpose of carrying out in detail the objects of government—essentially a revocable agency—having no vested right to any of its powers or franchises—the charter or act of erection being in no sense a contract with the state —and therefore fully subject to the control of the legislature, who may enlarge or diminish its territorial extent or its functions, may change or modify its internal arrangement, or destroy its very existence, with the mere breath of arbitrary discretion. . . .

"*Such a municipal corporation may be a trustee,* under the grant or will of an individual or private corporation, but only as it seems for public purposes, germane to its objects: . . . .

". . . When, therefore, the donors or testators of these charitable funds granted or *devised them in trust* to the municipality, they must be held to have done so with the full knowledge that their trustee so selected was a mere creature of the state, an agent acting under a revocable power. Substantially they trusted the good faith of the sovereign. It is plain—too plain, indeed, for argument, that the corporation by accepting such trusts, could not thereby invest itself with any immunity from legislative action. Such an act could not change its essential nature. It is surely not competent for a mere municipal organization, *which is made a trustee of a charity,* to set up a vested right

in that character to maintain such organization in the form in which it existed when the trust was created, and thereby prevent the state from changing it as the public interests may require: Montpelier v. East Montpelier, 29 Verm. 21. This whole question is put at rest, and that as to one of the most important of these trusts and as to this trustee, by the opinion of the Supreme Court of the United States in Girard v. Philadelphia, 7 Wallace 14: 'It cannot admit of a doubt,' says Mr. Justice GRIER, 'that where there is a valid devise to a corporation, in trust for charitable purposes, unaffected by any question as to its validity because of superstition, the sovereign may interfere to enforce the execution of the trusts, either by changing the administrator if the corporation be dissolved, or if not, by modifying or enlarging its franchises, *provided the trust be not perverted, and no wrong done to the beneficiaries.*"

## CY PRES

The doctrine of cy pres is totally inapplicable in the instant case because that part of the will which appellants attack, namely, testator's dominant intent to establish a home and college *for "poor white male orphans" is clearly and unmistakably declared and can be literally and lawfully carried out.* Appellants have completely misunderstood the doctrine of cy pres and when and for what purpose it will be applied. Cy pres is a well recognized equitable doctrine which is applicable when the object of a charitable bequest is not clear, or testator's dominant purpose and intent can not be literally and lawfully carried out, or when one or more of the directions concerning the charitable gift or the subordinate purposes or administrative provisions cannot be literally or lawfully carried out. In such an event the Courts sustain the charity and all

the provisions which are ascertainable and valid, and apply the bequest as well as the subordinate or administrative provisions of the will as nearly as possible to testator's general dominant intent.

14 Corpus Juris Secundum, Charities, §52, page 512, aptly and accurately states: "§52.—Cy Pres Power as Judicial Function. a. Definition and Nature. Cy pres means 'as near to', and the doctrine is one of construction, the reason or basis thereof being to permit the main purpose of the donor of a charitable trust to be carried out as nearly as may be *where it cannot be done to the letter.*"

*Williams Estate,* 353 Pa. 638, 46 A. 2d 237, furnishes an accurate exposition and a proper application of cy pres. In that case, testatrix left her residuary estate in trust to establish a charitable home in the dwelling house she occupied and the adjoining grounds contiguous thereto for aged women who were unable to support themselves. The prospective beneficiaries were limited to residents of the County of Tioga, Pa. The residuary estate was insufficient for the purpose of carrying out testatrix's intent in the exact manner prescribed as recited above. The Orphans' Court applied the cy pres doctrine and awarded the residuary estate to the Soldiers and Sailors Memorial Hospital for the approximate charitable uses which testatrix specified. The Court said: ". . . The case therefore properly calls for an exercise of the court's cy pres power to prevent a failure of the testatrix's general charitable intent.

"However, as we said in Wilkey's Estate, supra, [337 Pa. 129], at pp. 132-133,—'In applying the principle of cy pres the court does not arbitrarily substitute its own judgment for the desire of the testator, or supply a fictional testamentary intent, but, on the contrary,

it seeks to ascertain and carry out as nearly as may be the testator's true intention; . . .'."

In *Wanamaker Estate*, 364 Pa. 248, 72 A. 2d 106, where the fund was inadequate for the exact purpose designated by the testator, the doctrine of cy pres was wisely applied and the Court said, inter alia:

". . . When a court applies the doctrine of cy pres it is not thereby arbitrarily substituting a beneficiary in place of the one designated by the testator, nor is it substantially altering the testamentary intent; on the contrary, it is carrying out that intent in its broader outlines in accordance with the testator's more fundamental wishes as the court interprets them. . . ."

It is unnecessary to review additional authorities or to cite the many cases enunciating or dealing with the doctrine of cy pres in order to demonstrate what every student of the law of wills knows, namely, cy pres is never applicable to destroy a charitable bequest or a charitable trust, or to pervert or defeat testator's dominant intent, as appellants would have us do in the instant case by omitting the word "white".

### City Holds the Girard Estate, Not In Its Governmental Capacity, But If At All, Only In Its Fiduciary Capacity

It is, beyond any question, clear from Girard's Will that the City held Girard's residuary trust estate for the College *only in a fiduciary capacity*—that is as trustee for the persons, uses, purposes and trusts which were clearly set forth, defined and limited in Girard's Will. One of appellants' fundamental fallacies is their failure to recognize that the City can act in a fiduciary capacity as distinguished from a governmental capacity, and that with respect to Girard College (as also with respect to 88 other trusts) it

is acting *solely as a trustee.* Appellants likewise fail to realize that the manifold activities performed by the City in connection with Girard College are performed not in its governmental capacity, but in its capacity as trustee. We again emphasize that the Supreme Court of the United States expressly held in *Vidal v. Girard's Executors,* 43 U. S. 127, supra, that the City of Philadelphia took the bequest for the erection and support of Girard's orphanage establishment *"upon the trusts* and for the uses designated in the will. . . . . . . the charter of the city does invest the corporation with powers and rights to take property *upon trust for charitable purposes,* . . . . . . . where the corporation [the City] has a legal capacity to take real or personal estate, there it may take and hold it *upon trust, in the same manner and to the same effect as a private person may do.* It is true that, if the trust be repugnant to, or inconsistent with the proper purposes for which the corporation was created, . . . that will furnish no ground to declare the trust itself void, if otherwise unexceptionable; but *it will simply require a new trustee to be substituted* by the proper court, possessing equity jurisdiction, to enforce and perfect the objects of the trust."

In *Girard v. Philadelphia,* 74 U. S., supra, the Court again said: ". . . the corporation was vested with a complete title to the whole residue of the estate of Stephen Girard, *subject to these charitable trusts.* . . . The legislature . . . has given the widest powers to the trustee *to administer the trusts* and charities *according to the intent of the testator, as declared in his will."*

In *City of Philadelphia v. The Heirs of Stephen Girard,* 45 Pa. 9, the Court said (p. 25) : "It [the Will] is a devise of all the residue of his real and personal es-

tate to the city of Philadelphia, an existing corporation, *in trust, as his 'primary object,'* to construct, furnish, constitute, and maintain the institution now known as the Girard College, . . . ."

Not only did the Supreme Court of the United States as well as the Supreme Court of Pennsylvania and the lower Courts of Pennsylvania and the Legislature of Pennsylvania recognize (as above recited) that the City held Girard's residuary estate for Girard College *in its capacity as a trustee under Girard's Will,* but the City itself has recognized that the City held said estate *as trustee, and did not hold or own this property in its governmental or municipal capacity.* The City caused the Legislature in 1832 and 1847 to pass an Act authorizing it (a) to accept Girard's testamentary bequests for the improvement of the City, and (b) to carry out the charitable uses and trusts set forth in his will. This was wise because, as we have seen, the City of Philadelphia is not a sovereign, and the only powers it possesses are those granted to it by the Legislature, which, as stated by this Court in *Philadelphia v. Fox,* 64 Pa., supra, could be enlarged or terminated by the Legislature at will.

The Board of Directors of City Trusts contends that "poor white male orphans" means exactly what the testator said and should be upheld; on the other side, the City seeks to void or diametrically alter this bequest. *The City*—assuming, arguendo, that it has a standing in this case, although under the Philadelphia Home Rule Charter the Board of Directors of City Trusts is, as above noted, a separate and distinct entity which is excluded from the Charter—*has on five prior occasions demonstrated that its status and rights in the Girard Estate were only those of a trustee.* For example, in 1921 the City of Philadelphia in its gov-

ernmental capacity condemned and took from the City of Philadelphia, *Trustee under the Will of Stephen Girard,* Piers Nos. 1 and 2 on North Delaware Avenue, paying therefor *to the Trustee* out of the City's general funds, $849,672.46. On March 25, 1927, after application to and approval by the Orphans' Court of Philadelphia County, the City purchased two tracts of land at Swanson Street and Pattison Avenue, Philadelphia, for the sum of $15,600. This sum the City paid to the Board of Directors of City Trusts, *Trustee under the Will of Stephen Girard,* out of its general funds. In December, 1947, the City in its governmental capacity, condemned for playground purposes a tract of land in South Philadelphia which was a part of the Estate of Stephen Girard. A jury awarded to the *Trustee* the sum of $50,000. for the property; the verdict was paid by the City out of its general funds. With the approval of the Orphans' Court of Philadelphia County, the *City* of Philadelphia on May 8, 1953, *purchased from the Trustee* under the Will of Stephen Girard certain tracts of land in Pike County for $100,-000., said tracts to be used as a boys' camp. Again on April 5, 1954, by decree of the Orphans' Court of Philadelphia County, the *Trustee under the Will of Stephen Girard,* conveyed a tract of ground known as Girard Park, to the City to be used by the City for an open public place and park and for no other use and purpose whatsoever.

Do not those actions of the City further demonstrate that in its relationship to the Girard Estate it was acting solely as trustee and not in its governmental capacity!

How specious and fallacious is the appellants' argument that the City was acting in a governmental capacity instead of in a fiduciary trustee capacity with

respect to Girard's Estate, is further obvious from the fact that *if it were acting in a governmental capacity* or if its actions were "State action", *it could legislatively change or pervert or terminate all of the purposes and objectives* minutely prescribed in Girard's Will. For example, it could legislatively provide that all poor children, instead of poor white male orphans, could be admitted to Girard College; or it could provide that only female children could be admitted to Girard College; or it could provide for co-education; or it could, we repeat, alter or pervert at will or absolutely destroy the purposes and objectives of Girard's Will and exercise complete control over the College as if it were a public institution. Appellants do not specifically so contend, but that is the logical conclusion of their contention that the City was acting in a governmental capacity.

It is as clear as crystal that until the present suit was brought, the Courts, the Legislature, and even the City of Philadelphia recognized that the City did not own or hold Girard's residuary estate (for the orphanage establishment now known as Girard College) in its governmental capacity, but either it or the Board of Directors of City Trusts owned or held all the said property of the Girard Estate *as Trustee* for the persons, uses and purposes specifically set forth and defined and limited in and by Girard's Will.

The cases of *Wilson v. Board of City Trusts,* 324 Pa. 545, 188 A. 588, and *Girard Estate,* 73 D. & C. 42, on which appellants rely, refute, instead of support, the position of the appellants and their aforesaid contentions. What the *Wilson* case holds and stands for is clear from the following quotations from the opinion of this Court:

"S. Davis Wilson, as Mayor of the City of Philadelphia, and as a member of the Board of City Trusts,

petitioned the Court of Common Pleas of Philadelphia County for an alternative writ of mandamus to compel the remaining Directors of the Board of City Trusts to submit their books, records, accounts and documents relating to the management and administration of the moneys and properties in their control to three experts to be appointed by him, for the purpose of an inspection, examination and audit so that he might be enabled to properly perform his duties and functions *as a trustee* and properly protect and safeguard public interests and moneys. . . .

". . . All trusts created by wills are within the exclusive jurisdiction of the orphans' court and trusts inter vivos may fall within the jurisdiction of the two courts.

"To whom then is the Board of City Trusts accountable? The Act of June 30, 1869, P. L. 1276, provided that 'the duties, rights and powers of the City of Philadelphia, concerning all property . . . dedicated to charitable uses or trusts, the charge or administration of which are now or shall hereafter become vested in . . . the city . . . shall be discharged by the said city through . . . a board composed of fifteen persons, including the mayor of said city, . . . to be called directors of city trusts, who shall exercise and discharge all the duties and powers of said city, . . . concerning any such property appropriated to charitable uses . . . to the extent that the same have been or may hereafter be, by statute law or otherwise, vested in and delegated to the said city. . . .'.

. . "The common pleas judges, acting as a board of appointment, designate the members of the Board and may remove them (Act of June 30, 1869, P. L. 1276, Sec. 2, and Act of May 25, 1874, P. L. 228). This power they have, however, not in the capacity of a court, but as a board of appointment. The persons

named under the Act of 1869 are the representatives or agents of the City of Philadelphia *as trustee.* While the board of judges of the common pleas court appoints the trustees, the orphans' court possesses exclusive control over them in the conduct of testamentary trusts. *They are, as to the orphans' court, in the same situation as other trustees amenable to them.*

"What is the relation of this Board to the government of the municipality under the Act? As stated by Judge SHARSWOOD, in Philadelphia v. Fox, 64 Pa. 169, where the Act of 1869 first came up for consideration, it merely provided that one function of municipal government that had theretofore been exercised by the City generally, was removed and placed in a body of fifteen men, while the Mayor, Council and other officers continued to exercise all other governmental functions. Both groups are constituents of City government but they are independent of each other. Judge SHARSWOOD there said, the directors are '*a board dissociated from the general government of the city.*' It performs a part of the city's duties and as such, could be considered a part of the City government, *but its functions are apart from the general governmental powers exercised by the City itself.* . . .

"The law is clear that a trustee may compel his cotrustee to permit an examination, inspection and audit of the records of the trust estate and all matters in connection therewith that he may perform the duties with which he is intrusted and for whose exercise he is responsible."

*Girard Estate,* 73 D. & C., supra, is well summarized in the syllabus: "The orphans' court will, by virtue of the authority conferred upon it by the Revised Price Act of June 7, 1917 . . ., and the Fiduciaries Act of April 18, 1949 . . ., and in application of the cy pres doctrine, authorize the Board of Directors of

City Trusts charged with the administration of the Stephen Girard Estate to sell a large number of homes owned by the estate in Philadelphia, even though the will prohibits the sale of Philadelphia real estate, where it appears . . . that serious deterioration will occur in the foreseeable future, . . . that their operation is presently being conducted at a loss, . . . that the proceeds of the sale would produce a substantial income and that *such income is necessary in order to continue to carry out the primary purpose of testator's will, which is the operation of Girard College.*"

In that case Judge BOLGER said, inter alia: "These restraints upon alienation were advanced against the validity of the will in Philadelphia v. Heirs of Stephen Girard, 45 Pa. 9 (1863), wherein the court held that they did not affect the validity of the trust, since they applied only to the mode of administration.* In re Application of the City of Philadelphia, 2 Brewster 462, the court authorized leases of coal lands for 15 years, pointing out that no tenants could be obtained for a less period, and therefore the trust purposes would be gravely endangered if the five-year limitation prevailed.* The court held that the doctrine applied, . . . . It is clear to us that this is added reason why the foregoing legislation must be interpreted in the light of the cy pres doctrine, and therefore, we must find that *the retention of the real estate,* the subject matter of the instant petition, *has become incompatible with the maintenance and development of Girard College, which is clearly the dominant purpose of the trust.* . . . The various appellate decisions and

---

\* These cases and others herein cited hold that permission to lease or sell land contrary to testamentary directions gives the Court no right to invalidate or pervert or destroy the clearly expressed primary object and purpose of testator's Will, viz., an orphanage establishment for "poor white male orphans."

the decrees of this court in dealing with the problems which have arisen in the interpretation of the will of Stephen Girard, and in the administration of the trust, *are unanimous in finding that the primary object of testator* was the founding and perpetuation of the institution which we now know as Girard College."

All of the foregoing cases as well as the actions of the City itself make clear beyond the peradventure of a doubt that there is absolutely no merit in appellants' contentions that Girard College is City property owned by it in its governmental capacity, or that the City was the primary object of testator's bounty, or that the City could, in its governmental capacity or otherwise, divert the trust property to any public purpose or use it desired, or that it could rewrite testator's will in a manner and for a purpose diametrically different from the primary objects he so clearly specified.

It is, we repeat, impossible to read Girard's Will without being convinced that the primary object of his heart and soul and bounty was the construction and maintenance of an orphan establishment now known as Girard College—a home, college and orphanage for "poor white male orphans". It is a great and wonderful charitable trust which has been repeatedly sustained by the Supreme Court of the United States and by the Supreme Court of Pennsylvania and by the lower Courts of Pennsylvania for over one hundred years—it should not now be perverted or destroyed unless recent decisions of the Supreme Court clearly compel such a change.

RECENT DECISIONS OF THE SUPREME COURT

The final contention made by appellants is that Girard's charitable trust for "poor white male orphans" violates the Fourteenth Amendment to the Constitution of the United States and therefore can no longer be carried out. The Fourteenth Amendment

608

(Section 1) provides: "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. *No State shall* make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; *nor shall any State* deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

The cases on which appellants mainly rely to support this contention are *Brown et al. v. Board of Education*, 347 U. S. 483; *Bolling et al. v. Sharpe et al.*, 347 U. S. 497; *Barrows v. Jackson*, 346 U. S. 249; and *Shelley et ux. v. Kraemer et ux.*, 334 U. S. 1. These are factually very different from the instant case and do not control it. In the *Brown* case and its companion case, the *Bolling* case, the issue was the right of colored boys to attend a public school on an integrated basis with white students. The Court held that a segregated colored school was a violation of the Fourteenth Amendment and required public schools to be on an integrated basis. In the *Bolling* case the same principle was applied to the Federal Government under the Fifth Amendment. In those cases the public schools were, as their name implied, public schools founded and maintained and paid for by the State or by the Federal Government or by one of their (respective) agents out of public funds, namely, taxes or other public money. Neither those decisions, nor any other decision, nor the Fourteenth Amendment provide that a private individual cannot leave his money for a church or charity of his choice, or for a private school or for an orphanage for white persons or for any sectarian purpose. Cf. *Booker v. Grand Rapids Medical*

*College,* 156 Mich. 97; 10 Am. Jur. §516, p. 10; 56 C.J. §§1-3; 78 C.J.S. §§1-3; 11, 47 Am. Jur. §220.

In *Pierce v. Hill Military Academy,* 268 U. S. 510, the Court held that the State cannot, under its police power, deprive citizens of the right to establish private schools, or deprive parents of the right to have their children attend private schools, or compel parents to have their children attend public schools. Such a statute, the Court said, would be a violation of the Fourteenth Amendment. This was reiterated in *Connell v. Kennett Township,* 356 Pa. 585, 52 A. 2d 645; *Commonwealth ex rel. School District of Pittsburgh v. Bey,* 166 Pa. Superior Ct. 136, 70 A. 2d 693; *Commonwealth v. Beiler,* 168 Pa. Superior Ct. 462, 79 A. 2d 134.

The *Brown* and the *Bolling* cases, we repeat, dealt only with public schools owned and operated with taxpayers' money and did not purport to hold that a private school for white persons or a private charity or a sectarian church was or would be a violation of the Fourteenth Amendment. They are therefore clearly distinguishable.

In *Buchanan v. Warley,* 245 U. S. 60, a *City Ordinance* which forbade colored persons to occupy houses as residences in blocks where the greater number of houses were occupied by white persons, was declared unconstitutional as a violation of the Fourteenth Amendment. This is clearly distinguishable from the instant case because that was State or City action.

In *Corrigan v. Buckley,* 271 U. S. 323, plaintiff brought a suit in equity to enjoin the conveyance of certain real estate to a colored man in violation of an agreement between plaintiff and defendant and other landowners not to sell to any person of negro race or blood. The Supreme Court said (pp. 329-330):

"Under the pleadings in the present case the only constitutional question involved was that arising under the assertions in the motions to dismiss that the indenture or covenant which is the basis of the bill, is 'void' in that it is contrary to and forbidden by the Fifth, Thirteenth and Fourteenth Amendments. *This contention is entirely lacking in substance or color of merit.** The Fifth Amendment 'is a limitation only upon the powers of the General Government,' Talton v. Mayes, 163 U. S. 376, 382, and is not directed against the action of individuals. The Thirteenth Amendment denouncing slavery and involuntary servitude, that is, a condition of enforced compulsory service of one to another, does not in other matters protect the individual rights of persons of the negro race. Hodges v. United States, 203 U. S. 1, 16, 18. And the prohibitions of the Fourteenth Amendment *'have reference to state action exclusively, and not to any action of private individuals.'* Virginia v. Rives, 100 U. S. 313, 318; United States v. Harris, 106 U. S. 629, 639. 'It is State action of a particular character that is prohibited. *Individual invasion of individual rights is not the subject-matter of the Amendment.'* Civil Rights Cases, 109 U. S. 3, 11. *It is obvious that none of these Amendments prohibited private individuals from entering into contracts respecting the control and disposition of their own property;* and there is no color whatever for the contention that they rendered the indenture void."

The *Corrigan* case has been cited with approval many times by the Supreme Court of the United States. However, in the recent case of *Shelley v. Kraemer*, 334 U. S. 1, the Court emphasized the point that *Corrigan v. Buckley*, 271 U. S. 323, supra, did not decide whether the restrictive covenants could be judi-

---

* Italics throughout, ours.

cially enforced, but only whether they were valid and "since the inhibitions of the constitutional provisions invoked apply only to governmental action as contrasted to action of private individuals, there was no showing that the covenants, which were simply agreements between private property owners, were invalid." Again in *Hurd v. Hodge,* 334 U. S. 24, the Court emphasized that *Corrigan v. Buckley,* 271 U. S., supra, concerned "the validity of the restrictive agreement standing alone", while the *Shelley v. Kraemer* and *Hurd v. Hodge* cases concerned the "validity of Court enforcement of the restrictive covenants".

In *Shelley v. Kraemer,* 334 U. S., supra, the Court held that a colored man had a constitutional right to purchase and occupy property and that a racially restricted real estate covenant could not be enforced by the State Courts because it amounted to a denial by the State or its officers of the equal protection of the laws in violation of the Fourteenth Amendment. *The Court pointed out, however, that the constitutional provision was only a prohibition against the States and not against individual citizens.* The Court, speaking through Chief Justice VINSON, said: "Since the decision of this Court in the Civil Rights cases, 109 U. S. 3, the principle has become firmly embedded in our constitutional law that the action inhibited by the first section of the Fourteenth Amendment is only such action as may fairly be said to be that of the States. *That Amendment erects no shield against merely private conduct, however discriminatory or wrongful.*

"*We conclude, therefore, that the restrictive agreements standing alone cannot be regarded as violative of any rights guaranteed to petitioners by the Fourteenth Amendment.* So long as the purposes of those agreements are effectuated by voluntary adherence to their terms, it would appear clear that there has been

no action by the State and the provisions of the Amendment have not been violated."

The City in this case is not acting as a sovereign or as an agency of or for the State; if it is acting at all, it is acting, we repeat, *as trustee under a will of a private citizen.* The property involved is the property, not of the City or the State; it is the property of the Stephen Girard Estate and it is Girard's charity and benevolence and his will, not the charity or benevolence of the City or State, that alone is involved in this case. The Courts are not acting as an agency of the City or State to deprive these applicants of any constitutional rights—the applicants are the ones who are seeking State action in their behalf to invalidate a private Will in which they are not beneficiaries. This is the converse of *Shelley v. Kraemer* and would seem to be a matter completely outside of the Fourteenth Amendment.

Private trusts for charitable purposes, of which there are a myriad, have been sustained as valid by the Supreme Court of the United States and by the Courts of every State, particularly Pennsylvania, even where the class of beneficiaries was limited to racial or religious groups. Such charitable trusts are still valid and constitutional unless State or City action (or an agency thereof) deprives persons excluded from the charity, of their constitutional rights.

THIS CHARITABLE TRUST WILL NOT BE PERMITTED TO FAIL MERELY BECAUSE THE CITY DOES NOT DESIRE TO OR CANNOT LEGALLY ACT AS TRUSTEE

It is hornbook law that the Orphans' Court has the inherent power to remove a trustee and to appoint a new or substitute trustee, in order to protect or preserve the trust. If the City of Philadelphia does not

wish to act as trustee in this charitable estate or if for constitutional or other reasons it cannot carry out the trust for Girard College in accordance with Girard's clearly expressed purpose and his specific, as well as his dominant, testamentary intent—this would not void the trust or change it into a bequest to the City in its governmental capacity. Such a situation would merely require that a new or substitute (corporate) trustee should be appointed by the Orphans' Court, which can lawfully carry out the above mentioned trust for Girard College: *Vidal v. Girard's Executors,* 43 U. S. 127; *Girard v. Philadelphia,* 74 U. S. 1; *Bangor Park Association Case,* 370 Pa. 442, 88 A. 2d 769; *Jordan's Estate,* 329 Pa. 427, 197 A. 150; *Abel v. Girard Trust Co.,* 365 Pa. 34, 73 A. 2d 682.

### EFFECT OF CITY'S CONTENTIONS

If the present contention of the City is correct, its effect will be catastrophic on testamentary church and charitable bequests, as well as on the law of Wills in Pennsylvania. The constitutional prohibition against discrimination—the Fourteenth Amendment—is not confined to color; *it prohibits the States* from making any discrimination because of race, creed or color. It follows logically and necessarily that if an individual cannot constitutionally leave his money to an orphanage or to a private home and college for poor white male orphans, he cannot constitutionally leave his money to a Catholic, or Episcopal, or Baptist, or Methodist, or Lutheran or Presbyterian Church; or to a Synagogue for Orthodox Jews; or to a named Catholic Church or to a named Catholic priest for Masses for the repose of his soul, or for other religious or charitable purposes. That would shock the people of Pennsylvania and the people of the United States more than a terrible earthquake or a large atomic bomb.

We adopt what Judge LEFEVER, speaking for a unanimous six-man Orphans' Court of Philadelphia County, so well said: " 'The most solemn act of a man's life, which is consummated by his death, is his last will and testament. By that act he makes a law for the disposition of his own property, acquired by his own industry, which, if it does not contradict the law of the country, has hitherto been considered inviolate. Shall it be so considered no longer in Pennsylvania?' The Supreme Court of Pennsylvania answered 'No' to this interrogatory and declared unconstitutional an Act of Assembly which attempted to vary the terms of testator's will in setting up an orphanage.

". . . Significantly, he [Girard] did not specify any color limitation in the latter two gifts. Therefore, it is clear that he intended white, and no other, in the pivotal phrase now before us, viz: 'poor white male orphans', and that he knew how to say white when he meant white.

". . . There is no shortage of 'poor white male orphans'. In fact, there are more qualified applicants than can be accepted and accommodated. There is, therefore, no present failure of the purpose of the trust; a fortiori, there is no ground for the application of the cy pres doctrine. . . .

"The fallacy in exceptants' position is their contention that Girard College should be regarded as a public school. It is not. Girard College is a private school. It is more than that—in Stephen Girard's own words it is an 'Orphan establishment', where the objects of testator's bounty receive not only an education but also lodging, board, clothing and all of the necessities of life. The trust estate was created solely from the private property of Girard. Girard College was not established and it has never been operated at pub-

lic expense. Every dollar expended for construction, maintenance and operation of Girard College and for the education, maintenance and support of the students has come, and must come, from Girard's estate. Not one penny of the the trust estate has come from the City of Philadelphia, from the Commonwealth of Pennsylvania, [or] from any other governmental body, [or] nor from any source other than Stephen Girard. This privately established, privately financed, and privately maintained 'Orphan establishment' *cannot be equated* to a publicly financed and publicly maintained school."

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

Stephen Girard, the testator whose last will and testament is the subject of controversy in this lawsuit, was born in Bordeaux, France, on May 21, 1750. At the age of 14, he, like his father who was a mariner, took to the sea and made several voyages to the West Indies. When only 23, he became a duly licensed ship's captain, and sailed into many ports of the world. He first touched at American soil (San Domingo) in February, 1774, and in July of that year brought his ship for the first time to a North American continental port (New York). Then in May, 1777, he entered the waters of the Delaware and dropped anchor off Philadelphia's shores. He was never again to return to his original homeland. He rented a store on Water Street of that city and entered into business.

The shifting fates of the Revolutionary War, with the invasion and occupation of Philadelphia by British troops, drove him from the city on occasion but he always returned to Water Street. In this neighborhood, with the exception of a voyage to Charleston and the

Mediterranean, in a brig owned and commanded by himself, and which terminated in July, 1788, Stephen Girard from then on lived and died a citizen of Philadelphia which he admired and venerated with an ardor which often surpasses the devotion of native sons. During the epidemic of the yellow fever in 1793 and again in 1797-8, Stephen Girard aided the sick, comforted the dying, and made liberal contributions to the funds required in fighting the ravages of the pestilence which gripped Philadelphia in a threatening catastrophe. For his benevolent services in these trying periods of the city's history he was honored by his fellow-citizens with testimonials and public laudation.

In 1802 Stephen Girard was elected a member of the Philadelphia "city councils." He had now entered the banking field in which he prospered so signally that upon the expiration of the charter of the first Bank of the United States he took over the building theretofore occupied by that institution, named it the Bank of Stephen Girard, and developed it into one of the foremost financial institutions of the country.

For a period of upwards forty years, although engaged in a most extensive commerce, and the owner of numerous vessels employed in a very large foreign trade, Stephen Girard devoted most of his time to banking pursuits, varied by visits to his farm in Passyunk. As stated by Justice READ in his Opinion in the case of *Soohan v. City of Philadelphia*, 33 Pa. 9, from which most of this short biographical sketch is drawn, although Stephen Girard enjoyed a "reputation extending over the United States and Europe, as a wealthy and successful merchant and banker, his habits were so retired, plain, and frugal, that his person was unknown to many of his fellow-citizens. His fame and his name are indissolubly connected with the

great charity which created the subject of this dispute —his "orphan college." Another dispute over the "orphan college" has now, almost a century later, arisen and it is before this Court for decision.

In the year 1830, fully aware that the sands of life were running fast and that but few grains were left him to enjoy, having now reached his 80th birthday, Stephen Girard called in his lawyer and prepared to dispose, by will, of the enormous wealth, which his innate ability and shrewd foresight, cooperating with providential circumstance, had amassed. For several weeks the testator and scrivener toiled together and by February 16, 1830, there came to light a document of 35 pages which, through litigation, commentary, and application to the works announced therein, has inspired tens of thousands of pages of writing. In this document which disposed of his riches, Stephen Girard was just and generous to relatives who would survive his death, but he stopped short of the thought that they merited the lion's share of his financial empire. An avid reader of Voltaire's writings and other philosophical works, he believed that one's own community and mankind itself deserved a place in the sunshine of the good fortune which had blessed him in the gilded days of his profitable career. Thus, he bestowed on the City of Philadelphia and its people gifts which were more reminiscent of the largesse of a rich, benevolent city father than the munificence of a private citizen. For instance, he set aside funds with which to establish a competent police force, he bequeathed money for the gargantuan task of removing wooden buildings from the limits of the city, he provided for the paving and widening of certain streets, he supplied means for cleaning and keeping clean the city's docks on the Delaware, and redistribution of the waters of the Schuylkill River within the city limits. He made

available facilities to "improve the city property, and the general appearance of the city itself; and, in effect to diminish the burden of taxation, now most oppressive especially on those, who are the least able to bear it."

If anyone was entitled to be called "Mr. Philadelphia" in those days, it was Stephen Girard. In addition to the legacies above enumerated, he opened the flood of his generosity to such institutions as the Philadelphia Hospital, the Pennsylvania Institution for the Deaf and Dumb, the Orphan Asylum of Philadelphia, and various other organizations for relief of the poor and the distressed.

Grateful to the city which had made him rich, Girard was not unmindful of the opportunities afforded by a State government which allowed amplitude to the unfoldment of his business genius. Thus he bequeathed $300,000 to the Commonwealth of Pennsylvania for purposes of internal improvement by canal investigation.

While all these bequests evinced a warm disposition toward physically improving his city, bettering the general welfare of the people, and mitigating the hardships of the unfortunate, proving the truth of his statement that he had "sincerely at heart the welfare of the city of Philadelphia,"—what was even closer to his heart was the desire to aid in "educating the poor, and of placing them by the early cultivation of their minds and the development of their moral principles, above the many temptations, to which, through poverty and ignorance they are exposed": Towards the accomplishment of this desire he set aside $2,000,000 to provide "for such a number of poor male white orphan children, as can be trained in one institution, a better education as well as a more comfortable maintenance

than they usually receive from the application of the public funds".

In Clause XX of his will he stated: "Now, I do give devise and bequeath all the residue and remainder of my real and personal estate of every sort and kind and wheresoever situate . . . unto 'The Mayor, Aldermen and citizens of Philadelphia their successors and assigns in trust to and for the several uses intents and purposes hereinafter mentioned' ".

In Clause XXI he provided: "And so far as regards the residue of my personal estate, in trust, as to two millions of dollars, part thereof, to apply and expend so much of that sum as may be necessary—in erecting . . ." and maintaining the college which he described in the minutest of detail as to construction, architecture, furnishing, the employment of instructors, the feeding and the clothing of students. As a man of the sea, he could not, with more particularity, have prepared for the construction, maintenance, care, and navigation of a ship, than he directed as to what was to be done to launch his college for orphans. However, before the keel of this vessel of education could be laid, he required that the State do certain things— many things.

Stephen Girard was obviously aware that the enormous project of building a college, selecting and maintaining its students, hiring and paying for instructors, and increasing its capacity, *always on a non-paying student basis,* was one which called for the intervention of the State. However, as appreciative as he was of what the State and City had offered him in the way of opportunity, he was pragmatic enough to realize that even philanthropy calls for rigid organization and supervision. It also in some ways requires sanctions. The fond father who gives his child pennies if he will

eat spinach is applying a principle which reflects human nature in even lofty and exalted enterprises. It will be recalled that Mr. Girard bequeathed $300,000 to the Commonwealth. This legacy was conditioned upon the Commonwealth's enactment of the legislation necessary to permit Philadelphia to perform the cleaning, building, paving and other operations he had outlined. Stephen Girard also provided that if the City of Philadelphia did not carry out his wishes with regard to the Girard College, the residue of his estate (the $2,000,000 and accumulations) would go to the Commonwealth of Pennsylvania for internal navigation; and if the Commonwealth of Pennsylvania failed to "apply this or the preceding bequest to the purposes before mentioned," the money in that event would pass to the United States for the purposes of internal navigation.

It is difficult to imagine a testamentary disposition more completely interwoven with the public's welfare and responsibilities than the Girard will, all of which renders quite extraordinary the decision of this Court to the effect that the Girard College is simply a private institution. But that will be taken up later. Proceeding with our narrative of events, we arrive at the death of Stephen Girard on December 26, 1831, and the probating of his will on December 31, 1831.

Stephen Girard's will, as we have seen, envisioned a beautiful dream—a college for the education of the poor. But this dream would have died a-borning without State action. The General Assembly of the Commonwealth of Pennsylvania was required to act, and act within a year's time, if Philadelphia was to see one brick placed on top of another in the erection of Stephen Girard's temple of learning for poor children. The General Assembly lost no time in acting.

On March 24, 1832, it passed an Act directing the constituted authorities of Philadelphia to carry into effect the will of Stephen Girard.

Less than a month later (on April 4, 1832) the General Assembly passed another Act providing that "the select and common council of the City of Philadelphia, shall be and they are hereby authorized to provide by ordinance or otherwise, for the election or appointment of such officers and agents as they may deem essential to the due execution of the duties and trusts enjoined and created by the will of the last Stephen Girard."

Further State intervention was required before doors could be hung in the portals of Girard College. The Girard will stipulated that no orphan could be admitted unless some authoritative relative or "competent authority" guaranteed that the orphan would not be withdrawn from the school before termination of his studies. The Legislature, accordingly, on February 27, 1847, passed a Special Act making the City a guardian of every Girard College orphan and prohibiting interference from any relative. Paragraph 9 of Clause XXI of the Girard will provided that when the orphan students arrived at the age between 14 and 18 they were to be bound out by the City to suitable occupations until they had attained the age of 21. The Act of February 27, 1847, authorized the City to bind out the orphans until they reached their majority.

A fourth Act was passed by the General Assembly on April 30, 1853, meeting another requirement of the Girard will, namely, that the City be allowed to bind Girard College orphans as apprentices.

So much was the Girard will a matter of public business that at Harrisburg a special committee was chosen and entitled: Select Committee of the Pennsyl-

vania House of Representatives on the Estate of Stephen Girard. While the General Assembly was enacting legislation implementing the Girard will and supplying the legal equipment required to put the provisions of the will into effect, the City Councils of Philadelphia (Common and Select) were engaged in preparing for the erection of the college buildings. On March 21, 1833, the Philadelphia Council passed an ordinance providing for the construction of the school, entitling it the Girard College for Orphans, all building plans to be approved by Council. On July 14, 1836, an ordinance was adopted making provision for the purchase of books and paraphernalia. On January 28, 1841, the Council ordered that contracts entered into by the College had to be validated by Council. The Council appointed committees to handle the innumerable details connected with maintaining, creating, and running a college.

The cornerstone of the institution was laid on July 4, 1832, and it was officially opened for student occupation on January 1, 1848. On November 9, 1848, Council appointed a visitation committee to visit the college once a month and report on its findings to Council. That the Girard College was an object of continuous solicitude, care, and managership on the part of the City fathers is evidenced by the fact that between September 15, 1832 and December 18, 1869, the Council enacted 48 different ordinances devoted exclusively to the Girard College.

In 1869 the management and direction of Girard College was placed in the hands of a Board of Directors of City Trustees, created by the General Assembly (Act of June 30, 1869, P. L. 1276). This Board (hereinafter called the Board of City Trustees) was composed of the Mayor, the presidents of the Select and

Common Councils, and 12 other citizens to be appointed by the Court of Common Pleas of Philadelphia County. That Board is the governing body of Girard College today, administers the trust in all its ramifying particulars and selects the student body. The Treasurer of the City of Philadelphia serves as the Treasurer of the Board. Through this Board and through periodical examinations, visits, and audits the General Assembly maintains a direct supervision over the College and its activities. The Board is required to report annually to the City Council, to the State Legislature, and to the Court of Common Pleas, publishing its reports in the Philadelphia newspapers. The City Controller is required to audit the accounts. The Act makes the members of the Board city officers.

We have related how Stephen Girard declared in his will that the student body of Girard College was to be made up of "poor white male orphans." On February 1, 1954, William Ashe Foust and Robert Felder, two Negro fatherless boys, aged 8 and 7 years respectively, applied for admission to the Girard College, but were refused enrollment by the Board of City Trusts. In refusing the admission, the Board stated that it had been "advised by its solicitor that it has no power to admit other than white boys to Girard College".

On September 24, 1954, the rejected Negro applicants and the City of Philadelphia, acting through the Mayor and the Commission on Human Relations, filed separate petitions in the Orphans' Court of Philadelphia County for a citation upon the Board to show cause why the applicants should not be admitted. The Board admitted in its answer that the applicants had been denied admission solely on the basis of race. After hearing, the Court below upheld the action of the Board and the applicants appealed to this Court.

Since the Commonwealth of Pennsylvania was named the remainderman under the will of Stephen Girard, the Attorney General of the Commonwealth intervened to protect its rights as remainderman as well as its rights as parens patriae to supervise and enforce the provisions of a charitable trust. The Commonwealth upholds the position of the applicants that the Girard trust is a public charitable trust and as such is controlled by the Fourteenth Amendment. The City of Philadelphia, through the City Solicitor's office, takes the same position.

At the oral argument before this Court the Commonwealth, the City, the applicants, and the Board of Directors were all represented by able counsel who also filed informative briefs. The Court took the case under advisement and the Majority has now affirmed the decision of the lower Court. In its Opinion the Majority well stated the issue brought before us for decision:

"The question then, is whether the limitation in Girard's will to white children as the beneficaries of his college or orphanage, although undoubtedly lawful at the time of the execution of his will and of his death, has become invalid as a result of the adoption of the Fourteenth Amendment which prohibited any State from denying to any person within its jurisdiction the equal protection of the laws. No such question could possibly arise in the case of a private charitable trust for the Fourteenth Amendment applies only to agencies of the State or of a municipality within the State; it is directed solely against State, not individual, action."

Is then the action of the Board of City Trusts an action of the State? The Supreme Court of the United States said in the case of *Ex Parte Virginia*, 100

U. S. 339, 347, that when one "acts in the name and for the State, and is clothed with the State's power, his act is that of the State." How can there be any doubt that the State of Pennsylvania speaks in the administration of the Girard trust? We have seen the State passing five different statutes devoted to the Girard trust. We have witnessed the State setting up the machinery for running the Girard College. We have noted that the House of Representatives formed a special committee to consider the Girard estate. And it must particularly be observed and emphasized that the State's concern for the Girard trust is not a matter of past tense. It *today* expresses a direct supervision over the administration of Girard College. Members of the Legislature visit it officially. The City of Philadelphia is required to submit periodical reports on the College to the Legislature. The accounts of the College are open to the State's inspection.

It is a matter of no little weight in determining whether the Girard trust is a public or private charity to note that the City itself makes no effort to conceal the governmental character of its involvement in the direct management of the College. The rejection by the Board of City Trusts of the applications of Felder and Foust was written on official stationery of the City bearing in large type the words CITY OF PHILADELPHIA.

How can it be doubted that in creating the Board of City Trusts the General Assembly intended to bring into being a governmental agency? The enabling Act provided that all duties, rights and powers of the City of Philadelphia with respect to property dedicated to charitable uses or trusts are to be discharged by the City "through the instrumentality of a Board com-

posed of fifteen persons including *the mayor of said city, the presidents,"* etc., "who shall exercise and discharge *all the duties and powers of said city . . ."* The Board is directed *"in the name of the . . . City . . .* to make all necessary agreements", and "for and *in the name of the said City* to do, perform and discharge," all necessary acts in the discharge of the trust. And then, as if to eliminate the possibility of questions in the future as to the authority of the Board, the Act specifically declares that "The said directors, in the discharge of their duties, and within the scope of their powers aforesaid, *shall be considered agents or officers of said city . . ."**

The State could have refused to accept, had it chosen to do so, the largesse of Stephen Girard, but it did not so refuse. On the contrary, it eagerly and enthusiastically accepted every proposition advanced by Mr. Girard in his will. The testator spelled it out clearly that if the State was to receive the $300,000 he bequeathed to it, it had to enact certain enabling laws. By accepting the legacy and by passing the requested legislation the State has entered into a contractual obligation which it cannot ignore.

The Majority of the Court seems to have difficulty in finding that the Girard College is a public institution. The job, as I see it, is not how to find that the Girard College is a public charity, but to ascertain by what processes of search, reasoning, and logic it is possible to declare it is a private charity. With the exception of the fact that Stephen Girard originally supplied the funds for the founding of the institution there is not one item in the whole 125-year history of Girard College to support the contention that it is a private institution. The $2,000,000 originally be-

---

* Italics throughout, mine.

queathed for the college was exhausted with the final construction of the buildings. Had it not been for the able managership of the City of Philadelphia and the guiding hand of the State of Pennsylvania, the Girard College would most likely have remained a group of empty buildings unenlivened by the shouts of happy children within. Because of the pains taken, the time spent, and the wisdom exercised by the City of Philadelphia acting through its designated officials, the Girard estate, after a perilous escape from a near-foundering, has sailed on to fortune, having now an appraised value of $98,000,000. Its real property alone is worth over $10,000,000. And it must not be overlooked in this connection that the Girard estate did not have to pay commissions on income and capital gains, which it most assuredly would have had to do if the trustees had been private trustees instead of governmental agencies.

Stephen Girard planned well. He knew that without the power, the authority, and the ceaseless supervision of the State, it would have been impossible to crystallize into reality his cherished hopes for a college for non-paying poor children. If, by some dreadful retroactive cataclysm, there would fall out of present reality, all the governmental authority, direction, control, and guardianship which have gone into the Girard College for the last 125 years, the college would today be but a withered dream hanging disconsolately on the melancholy vine of unrealized hopes.

The only question in this case is whether the Girard College is a public institution. If it is, it cannot avoid the Fourteenth Amendment and it must therefore admit the applicants in this case. Instead of considering this issue, which the Majority itself has pointed out, the Majority goes on to discuss at great length a

matter that is not in dispute at all, namely, that a testator has the right to leave his property to whomsoever he wishes. Certainly a testator is entitled to choose the beneficiaries of his bounty, but if he asks the government to administer his estate he cannot expect the government to ignore the very law it symbolizes. Parents who consent to have their child adopted by others cannot complain if the adopting parents, raising him in another state, follow the law of that State instead of the law of the State in which he was born. If a testator should today leave his property in trust to the State for the training of destructive atom bomb engineers, and then later on the destructive atom bomb should be proscribed, the government could not be compelled to go on instructing students in a sphere of education beyond the pale of the law.

In 1870, this Court had before it for consideration the Act of June 30, 1869, P. L. 1276, which created the Board of Directors of City Trusts. Referring to that case the Majority Opinion says: "The Act was upheld as to its validity in Philadelphia v. Fox, 64 Pa. 169, where the policy it represented was described (p. 183) as 'having such a board dissociated from the general government of the city' ". But the Majority only released part of the quotation. The whole passage reads as follows: "We have nothing to do with the wisdom of the measure—with the policy of having such a board dissociated from the general government of the city, or with the mode of its selection. Those are questions exclusively for the legislature. No one I think can doubt that it was entirely competent for that authority to vest the entire management and control of all municipal affairs in just such a body as that constituted by this act. If they could do the greater, they can do the less. They could make a similar provision for any other department of the municipality. They might es-

tablish a board of police, of highways, of sewerage, of cleansing." It will be seen that in the *Fox* case the Court equated the Board of City Trusts with a municipal board of police or a board of highways. How can one fail to see that when the Court there spoke of a board "dissociated from the general government," it meant something dissociated from sovereign authority? If it had meant what the Majority here wants to try to have it mean, the Court would never have included a board of police as an illustration because a board of police is certainly part of the municipal government.

The Majority picked up from the *Fox* case a mere fragment and then dropped it. If it had lingered a little longer in discussion with that epochal decision, it might have concluded that in reality it is decisive of the question before us. For instance, Justice SHARS-WOOD, who wrote the decision, said: "Such a municipal corporation may be a trustee, under the grant or will of an individual or private corporation, but *only* as it seems *for public purposes, germane to its objects* . . . I am aware that it has been said by high authority in England that it may take and hold in trust for purposes altogether private . . . But the administration of such trusts, and the consequent liabilities incurred, are altogether inconsistent with the public duties imposed upon the municipality." If this Court follows the *Fox* case, and it is bound to do so since the Majority cites it favorably, it cannot possibly declare the Board of City Trusts to be engaged in administering a private trust. A municipal corporation, as Justice SHARSWOOD stressed, may only be a trustee where the grant has to do with *a public purpose,* germane to the object of the corporation. Justice SHARSWOOD said further: "When, therefore, the donors or testators of these charitable funds granted or devised them in trust

to the municipality, they must be held to have done so with the full knowledge that their trustee so selected was a mere *creature of the state, an agent acting under a revocable power* . . . It is surely not competent for a mere municipal organization, which is made a trustee of a charity, to set up a vested right in that character to maintain such organization in the form in which it existed when the trust was created, and thereby prevent the state from changing it as the public interests may require".

It is obvious from the above that the City of Philadelphia, as a branch of the State government, cannot entertain a right which would prevent the State from changing it as public interests may require, for instance, as the Fourteenth Amendment requires.

Counsel for the applicants put it very well in their brief when they say: "If Girard had been able to set up and maintain Girard College in the manner described in his Will without any special state and municipal legislation, and without the use of public officials, we might be dealing with the situation envisioned by the Orphans' Court, to wit: purely private arrangements enforced and observed without any State action. But this was not the case." Indeed it was not the case. As already pointed out, in effectuating the objectives of his will, Stephen Girard called on the Legislature of Pennsylvania, the City Council of Philadelphia, the Mayor of Philadelphia, and the Treasurer of Philadelphia. Then the General Assembly of the Commonwealth added for his benefit the services of the judges of the Courts of Common Pleas (now 21) in appointing the Board of City Trusts administering his estate. If such a plethora of governmental activity does not make Girard's trust a public trust, then the word "public" has undergone a mysterious transforma-

tion which is not recorded in the dictionaries of the English language or the lexicon of the law.

Counsel for the Board of City Trusts in their brief tell how the $2,000,000 set aside for the erection of the college was not sufficient for the purpose because of a great depreciation in the value of some of the investments due to the financial panic of 1837. After this statement, counsel go on to make this significant declaration: "Not only was there a depreciation in the value of some of the investments, and consequently insufficient revenue for the completion of the buildings of the college (Soohan v. City, 33 Pa. at page 23), but the Councils used income from the Girard Estate for *municipal purposes other than the College,* amounting to $571,958.42, in the years 1833 to 1848 inclusive". Is it necessary to expatiate on that disclosure? "Councils used incomes from the Girard Estate for municipal purposes"! Can anything be more public than municipal purposes? Incidentally these revealing statistics are drawn from the Report by Hon. George Wharton Pepper, Auditor.

The Majority attempts to draw a distinction between the City of Philadelphia and the Board of City Trusts, in spite of the fact that the Board of City Trusts has in the very heart of its organization the chief executive officer of the city, the Mayor; and its chief financial officer, the Treasurer. In support of its strange conclusion the Majority says that the fact the Board filed an answer to the City's petition is evidence of "the complete severance between the city in its ordinary municipal or governmental capacity and the Board of Directors of City Trusts administering the trusts confided to the city as trustee." But the action of the Board in this respect is merely self-serving. It is not the first time in the history of government

that a subsidiary body presumes to question the authority of its parent body.

If the bland affirmation of the Board makes the Board something removed from the City, then the whole present litigation is moot, and this Court is engaged in static academic philosophizing. But it is not enough for the Board to say that it forms no part of the City. This is something it must prove and I submit it can no more prove such severance than the tentacle of any invertebrate can, by mere assertion, make itself independent of the body from which it draws life. While not of any great importance, it is a matter of human interest at least to point out that the attorneys for the Board, in a moment of factual realism, detached from the part they are enacting in this litigation, referred to themselves as "Attorneys for the City of Philadelphia." On the cover of their brief they sign themselves: "*Attorneys for The City of Philadelphia,* Trustee Under the Will of Stephen Girard, Deceased, Acting by the Board of Directors of City Trusts."

In their brief the Board attorneys concede that the Board is a governmental agency but maintain it does not act as a governmental body. But if it is a creature of the law, which it is, it must respond to the law, and, acting according to the law, it cannot possibly ignore the provisions of the Fourteenth Amendment.

The Board's attorneys state further in their brief: "No one doubts that the Board is an agent of the City, but the City and the Board together are agents of Stephen Girard to carry out the terms of the will." But can the City be the agent of a private individual? The City may no more be an agent of a deceased citizen than it can do the bidding of a living private person. Our whole democratic form of government is

founded on the proposition that public officials have but one master and that is the public.

In contending for their position the attorneys for the Board argue that it is not the State or the City which offers educational facilities of Girard College to anyone, but that it is Stephen Girard who does so on his own terms. And then the writer of the Board's brief enunciates in epigram and in italics: *"Since the State offers nothing to anyone, it can scarcely be said to deny something to someone."* But one could reply with an equal economy of language to this apothegm by saying that: In the exercise of its sovereign powers the State offers all opportunities to everybody, and when it denies anything to anybody it denies something to everybody.

The Majority Opinion makes reference to the Philadelphia City Charter and seems to find therein support for its thesis by declaring that the Charter says it does not apply to the Board of City Trusts. However, it seems to me that this exclusion does not mean that the Board is any less governmental. On the contrary, it could mean just the reverse because the Board, being a distinct creature of the Legislature, is under the control of the Legislature and must, as we have seen, report to the Legislature as well as to the City.

In the case of *Girard's Appeal,* 4 Pennypacker 347, 361, this Court specifically stated that "the directors of city trusts are *a department of the municipality* which the Legislature had a constitutional right to establish." This Court said further in that case: "A man who constitutes such a municipality his trustees, does so subject to all the changes which the sovereign power may make in its character and organization." Thus, it is futile to reason that the Board of City Trusts has no power to do anything which seems to be in opposition to the testator's words. The Board,

being a child of the Legislature, is a public agency and, regardless of apparent prohibition in the provisions of the trust document it is carrying out, cannot avoid enforcing the law of the State which is its master.

The Majority introduces the statement that the City is administering some 89 charitable trusts at this time. I do not know what are the provisions of these trusts, nor do I think the Majority knows either. In any event it is entirely irrelevant to speak of these other 88 trusts, for it is safe to assume that not one of them is so interlocked with the State and City as is the Girard trust. And it is not unfair to assume, since the matter has not been called to our attention, that none of those trusts contains provisions in opposition to the Fourteenth Amendment.

The Majority advances the idea that if the Board of City Trusts is engaged in "State action", the petitioners would still not be entitled to the remedy they seek because the Orphans' Court could appoint another trustee. The Girard will provides in Article XXIV that if the City wilfully and knowingly violates any of the conditions in the will, the remainder and accumulations will go to the Commonwealth of Pennsylvania. The Majority seems to be of the impression that the college could go on operating just the same even if it were deprived of these enormous resources because it would always have the income from the real estate. But there is no evidence whatsoever that with the City withdrawn from the administration, and the remainder and accumulations paid over to the Commonwealth, the Girard College could continue with the large student body it now accommodates, if indeed it could live at all. The Majority feels that it could, and says that on this point the testator "speaks from the grave." Being dead since 1831, I would think that on all points the testator speaks from the grave,—and

that on all points it is clear that Stephen Girard's primary objective was to dedicate his entire estate to the public in one form or another. In paragraph 9 of Article XXI, he said: "In relation to the organization of the college and its appendages, I leave, necessarily, many details to *the Mayor, Aldermen and citizens of Philadelphia and their successors;* and I do so, with the more confidence, as, from the nature of my bequests and the benefit to result from them, I trust that my fellow citizens of Philadelphia, will observe and evince especial care and anxiety *in selecting members for their City Councils and other agents"*.

The polar star of Stephen Girard's entire testamentary disposition was the welfare of Philadelphia. He specifically provided for municipal improvements, assistance to charitable institutions, and education for children, all objects of governmental concern.

The lower Court, in affirming the rejection by the Board of City Trusts, emphasizes that Stephen Girard made it very clear that the students for Girard College were to be limited to "poor white male orphans," and that since the language was very specific, there was therefore no need of interpretation or construction. The Court highly praised the unequivocality of Girard's language: "Among the outstanding characteristics of this will is the meticulous use of plain, unequivocal and unambiguous language. A reading of the will, from its beginning to end, leaves no doubt that Girard knew exactly what he intended, and expressed his many intentions with clarity and simplicity."

Because of this clarity and simplicity the Court resolved that no canons of construction are to be used, that the words in Girard's will mean what they say and nothing else, and must therefore not be altered to mean something else. The fact, however, remains that various words and phrases in Girard's will have

been interpreted to conclude something different from their literal purport. In all verity, in at least one instance, the interpretation was made to mean exactly the antithesis of the plain declaration of the language. Stephen Girard specifically announced in Article XX of his will: "So far as regards my real estate in Pennsylvania, in trust, that *no part thereof* shall ever be sold or alienated". But real estate belonging to the Girard estate has been sold. The Majority Opinion here, in affirming the lower Court's Opinion, seeks to explain this diametrical defiance of Mr. Girard's specific request by saying: "It is true that there were some sales made under the authority of the Orphans' Court but only because the income of the trust had shrunk to a point where the college could not be efficiently maintained and therefore the sales were the only recourse open in order to preserve the purposes of the trust; this was purely an administrative matter, sanctioned by law". This may explain away for the Majority the alteration in the will, but it cannot be denied that the will was made to say something which Mr. Girard did not say.

Stephen Girard also declared that the terms of leases of his real estate were not to exceed 5 years. Despite this precise limitation of 5 years, the Board of City Trusts has, under the authority of the Court, executed leases for 15 years. The Majority also excuses this change with the remark that it was impossible "to secure good tenants on shorter term leases." But it cannot be gainsaid that liberties were taken with the plain, unequivocal, and unambiguous language of Stephen Girard.

It is strange that the Majority makes no reference to the most drastic change of all in Girard's will. If anything was made clear in the Girard will it was that he was creating a trust estate for the benefit of or-

phans. The question has arisen as to whether the term "orphan" should mean orphans regardless of race, but there can be no question that the beneficiaries had to be *orphans,* that is, children who have lost both father and mother. We know, however, that the Board of City Trusts admits to Girard College fatherless children who have living mothers.

Webster's Unabridged International Dictionary defines an orphan as: "A child bereaved by death of both father and mother, or less commonly of either parent —in the latter case sometimes called half-orphan." But the Girard will did not speak of half-orphans. It spoke of orphans. In any event, if the word orphan is intended to include fatherless children, why does it not also embrace motherless children? Are children of 6 to 10 years in less need of a mother than a father? I believe that this Court in the case of *Soohan v. City of Philadelphia,* 33 Pa. 9, was entirely justified in including fatherless children under the term *orphan* because it was interpreting the spirit of the Girard will which was directed toward taking care of children who were poor and in need of attention and care.

But if the word *orphan,* for reasons of benevolence and humanity, was to be enlarged to encompass children who have lost their father but not their mother, why did the interpretation not include those children who have lost a mother but still have their father? Charity should not strain at mere words nor walk on the stilts of syntax. Stephen Girard's primary objective was to befriend poor children without adequate care. Since this. Court allowed Girard's meaning to break through the imprisoning syllabic walls. of *orphan,* why did it then limit the freed meaning to fatherless children?

The Majority, quoting from the case of *Franklin's Administratrix v. City of Philadelphia,* 2 D. R. 435,

said that despite various "onslaughts" on the Girard will, the Girard charity was left "fixed, firm and immovable as a rock." It has been shown, however, that the granitic stability of the will did not prevent a softening of its provisions to allow the sale of real estate, it did not hamper the augmenting from 5 to 15 years of leases, it did not interfere with the humanitarian enlargement of the term *orphan* to include children with a mother living. Why must it then remain implacable in the presence of the Fourteenth Amendment to the Constitution of the United States?

The Majority indicates that Girard's purpose in deeding his estate over to the City of Philadelphia as a perpetual trustee was due to the fact that there were no trust companies in existence at the time with facilities for perpetual administration. In this respect the Majority writes: "James G. Smith, in his book on 'Trust Companies in the United States,' speaks (p. 233) of the age-long 'search for a continuous trustee.' " But this does not say that the search was unsuccessful. There was an age-long search for a route to India also, but it was finally successful.

The full sentence, from which the Majority quotes five words, reads: "Another interesting example of this search for a continuous trustee is the board of trustees in charge of the Delaware General Loan Offices which were first established in 1759."

Seventy-one years were to pass, after 1759, before Stephen Girard sat down to compose his long will. In the meantime a continuous trustee was not the faraway Indian pearl suggested by the Majority. An advertisement in the New York Evening Post, August 6, 1822, of a corporation seeking trust business (and quoted in the same book cited by the Majority, p. 247), proclaimed: "The public will readily perceive, that the advantages of this company to *protect property* for

the benefit of *infants* or *others*, are far greater than those of individual executors or other trustees, who are always liable to casualties . . . By placing such property in the charge of this company, *who have continued succession,* there can be no danger whatever of any such casualties." (Italics in original advertisement)

In seeking to interpret Stephen Girard's intent in the matter just discussed, the Majority says: "If speculation were to be indulged in—". But why indulge in speculation when the 35-paged will of the testator demonstrates on almost every page that Girard wished the government to handle his estate because he was making the public his beneficiary and he particularly wished the government to stand behind his college? He desired a government trustee because he knew that government activities are more exposed to public scrutiny than private enterprises and that, under the spotlight of public attention, there would be less chance for corruption, inertia, and mismanagement to worm their way into the trust estate and eat out its substance. Girard was so determined that the whole project be governmental that he directed that if the City of Philadelphia failed to carry out his instructions, the Commonwealth of Pennsylvania would become the successor in title, and if the Commonwealth was also indifferent to its obligations under the will, the estate would then become the property of the United States of America. What more could a person do to demonstrate the undeviating public character of the trust?

The Majority Opinion quotes over and over the line which is slightly revolting to me that a man's prejudices are part of his liberty. From a philosophical point of view I would say that a prejudiced person may have the right to hurt himself through the indulgence of his prejudices, but he has no right to affect

the liberty of others. But be that as it may, no testator has the right to ask the government to do something which is prohibited by the Constitution. All this, however, is beside the point. There is no evidence that in writing his will, Stephen Girard was motivated by prejudice. In 1830 the Federal Constitution sanctioned slavery.

As evidence of Mr. Girard's lack of prejudice it is to be noted that although he forbade clergymen to enter the college he did not prohibit religious instruction in the college. Justice STORY in the famous case of *Vidal v. Philadelphia,* 43 U. S. 127, spoke to this subject as follows: "The Testator does not say that Christianity shall not be taught in the college. But only that no ecclesiastic of any sect shall hold or exercise any station or duty in the college. Why may not the Bible, and especially the New Testament, without note or comment, be read and taught as a divine revelation, in the College—its general precepts expounded, its evidences explained, and its glorious principles of morality inculcated?" In fact, Stephen Girard specifically declared in his will: "My desire is, that all the instructors and teachers in the college shall take pains to instil into the minds of the scholars the purest principles of morality, so that, on their entrance into active life, they may, from inclination and habit, evince benevolence towards their fellow creatures, and a love of truth, sobriety and industry, *adopting at the same time such religious tenets as their matured reason may enable them to prefer.*"

Supporting the decision of the Board of Directors of City Trusts which excluded the applicants, the Majority argues: "Stephen Girard naturally must have realized that he could not create an institution large enough to furnish both sustenance and education to any and all the children of Philadelphia, Pennsylva-

nia, New York and New Orleans who might desire to be admitted; he could provide for only a small minority of such children and accordingly he prescribed a method of selection as he had both a legal and moral right to do unless there were involved a violation of some affirmative provision of law." But this is an argument which crumbles at the slightest touch of logic. It cannot seriously be maintained that Stephen Girard himself could build a college large enough to house all the poor white orphan boys in Philadelphia, New York, and New Orleans. Even if he limited himself to the numbers suggested by the Majority, there would still be left countless numbers of boys that could not enjoy his limited fortune. Stephen Girard's restriction, therefore, was not based on the proposition of accommodating numbers of children to quantity of dollars. The limitation indicated was merely an expression of Mr. Girard's determination to help as many as he could on the thoroughfare of life, just as one might build a fountain along the road to refresh such travellers who came that way, without intending that the whole world should bend its steps toward that particular highway in order to obtain a draught of water.

The Majority Opinion quotes from the case of *Rice v. Sioux City Cemetery*, 349 U. S. 70, 72, that: "Only if a State deprives any person or denies him enforcement of a right guaranteed by the Fourteenth Amendment can its protection be invoked." But it is specifically a State deprivation which is involved here. In administering the Girard trust, the Board of City Trusts is acting for the City of Philadelphia which is a branch of the State; and, by failing to invoke the Fourteenth Amendment, it is guilty of a State deprivation.

The Majority declares that "It is perfectly clear, therefore, that private trusts for charitable purposes,

not being subject to or controlled by 'State Action,' are wholly beyond the orbit of the Fourteenth Amendment." But this assumes what the Majority has not established, what the lower Court has not established, and what the Board of City Trusts has not established, namely, that the Girard trust is a private trust for charitable purposes. On the contrary, it is impossible to conjure up a more obvious public trust than this one. It was baptized by the State, it was confirmed by the State, the State guided it by the hand in its infancy, and the State stands beside it today in direction, counsel, management, and supervision.

The Majority reasons further that: "Such trusts [private charitable trusts] abound in overwhelming numbers and there can be no question as to their legality however limited be the class of their beneficiaries or whatever be the nature or basis of their restrictions; charitable trusts for limited groups, whether racial or religious, are as valid as if for all the people of the world." But here the Majority shoots wide of the target. We are speaking here, not of private charitable trusts; we are speaking of public charitable trusts *administered by the government*! In every reference to the Girard charity trust, there must be added in assumed parentheses the limitation: Charitable Trust administered, controlled and directed by the State, which of course, makes the trust something quite different from the charity which the Majority is defending, but which needs no defense because it is not being attacked by anyone.

The Majority says that: "We have charitable trusts for ministers of various church denominations, for foreign missions, for churches, priests, Catholics, Protestants, Jews, whites, negroes, for relief of the Indians, for widows or orphan children of Masons or other fraternities, for sectarian old folks homes, or-

phans, and so on". But in the illustrations given the government does not administer, the government does not audit, the government does not direct, the government does not control—as it does in the Girard charitable trust. The Majority Opinion defends, defends and defends a cathedral in the wilderness near which, in the whole century-old litigation over the Girard estate, not a hostile arrow has fallen. Certainly there can be a charitable trust for Indians, but to say that such a trust administered by the government may legally and constitutionally deny Indians any of the provisions of the Bill of Rights or of the Fourteenth Amendment is to pose what everyone knows to be insupportable.

The Majority adds: "It is true that Girard appointed the City of Philadelphia as the trustee to administer the trust according to the terms of his will, but he certainly did not intend thereby to empower it to conduct such administration in its *public or governmental capacity,* or to bring into play any of its *proprietary* rights since it is merely the title holder of Girard's property and not its beneficial owner." (Italics in original). But how else can a City act except in its public or governmental capacity? A City is not like an individual citizen. It is the composite of all the citizens: it speaks and acts for everyone within its boundaries. The Majority says that the City is not the beneficial owner of the trust estate. It is indeed a beneficial owner. It is accepting the benefits of an obligation which otherwise it would have to discharge, namely, educating the children who are actually in Girard College.

The Majority asserts that the City is acting only as a fiduciary, but what is meant by acting as a fiduciary? The City does not have a fiduciary existence.

It has only a municipal existence. The fact that it owns and operates a golf course does not make it a country club; the fact that it stages open air light opera does not make it an entertainment entrepreneur; the fact that it owns and operates swimming pools does not make it a recreation park promoter. There is not a private school in the whole State of Pennsylvania which is controlled and managed by a City or any municipality as is the Girard College.

The Majority declares itself unable to perceive any difference between the legal principles which apply to Girard College which "is a comparatively large institution," and those which govern "the smallest of private schools." The difference, however, is one which requires no microscope to detect. The Girard College has a board of directors made up of the Mayor of Philadelphia, the President of City Council, and twelve members appointed by the Courts of Common Pleas. This Board thus represents the body politic, the public, the citizenry of the County of Philadelphia, a sovereign subdivision of the sovereign State. Since our judges are elected by the people, as are the Mayor and President of City Council, the Board of City Trusts is therefore an expression of the people themselves. The private school, on the other hand, is strictly a private commercial enterprise run for profit. The legal principles which control Girard College are separated by a chasm as wide as the constitution itself from a private school owned by private individuals, and run by private individuals, all for the monetary advantage of private individuals. Private schools receive no tax exemption. For that reason alone the legal principles which guide their destiny are quite different from those which apply to Girard College which enjoys a tax exemption annually of $550,700. (*Ogontz School*

*Tax Exemption Case,* 361 Pa. 234). No private school in the State can boast the governmental direction, control, and privileges which are as much a part of Girard College as the buildings themselves.

The Majority makes the statement that the Girard College "has been supported and maintained for now over a century by Girard's estate; not a penny of State or City money has ever gone into it." The obvious answer to that observation is that the State and the City have spent "not a penny" but countless tens of thousands of dollars in making Girard College the institution it is today. Who can calculate the cost to the State of the printing, clerk hire, and secretarial service which went into the actions of the General Assembly in holding hearings, conducting investigations, drafting bills and enacting them into law? Who knows how much it cost the City of Philadelphia for the hearings on and the printing of the 48 ordinances passed by the Council of Philadelphia in organizing and directing the establishment of Girard College? Who knows how much it cost for all the special visitations, for the audits, for the inspections and examinations conducted by the State of Pennsylvania and the City of Philadelphia in behalf of Girard College? Who knows what it cost the City to work out the investments which have increased the capital of Girard College from near-extinction to $98,000,000?

The Majority reminds us that: ". . . it must also be remembered that the city in its own right was a second beneficiary of part of Girard's residuary estate, so that it had an independent interest of its own to protect, wholly apart from its status as fiduciary." But the fact that the City had an independent interest of its own to protect proves all the more the *public* nature of the City's interest in the Girard estate; and that is

the only question before us in this appeal, namely, is Girard College a public institution or a private charity?

The theory advanced by the appellees that if the decision of the lower Court is reversed, testators in the future will not be permitted to leave their property to whomsoever they wish is sheer chimera. The freedom of *jus disponendi* will never be curtailed in America; it is part of our American liberties. What the Commonwealth, the City, and the appellants contend, and properly so, is that if a testator, for benefits which accrue to his estate and to the accomplishment of his desires, wills his property to the government in trust, he may not ask the government to do anything which is contrary to the objectives of the government.

The whole history of Stephen Girard's life and the wording of his will demonstrate that he never intended, desired, or wished that the government should administer his trust in any way which would run counter to the intendment of the Constitution. In fact among his last words appeared the following: "And, especially, I desire, that by every proper means a pure attachment to our republican institutions, and to the sacred rights of conscience, as guaranteed by our happy constitutions, shall be formed and fostered in the minds of the scholars."

The phrase "happy constitutions" undoubtedly refers to the Constitution of Pennsylvania and the Constitution of the United States. Adherences to those Constitutions requires the reversal of the decision of the Court below.